221 U.S. 361 (1911)
WILSON
v.
UNITED STATES.
SAME
v.
SAME.
SAME
v.
SAME.
Nos. 759, 760, 788.
Supreme Court of United States.
Argued March 2, 3, 1911.
Decided April 15, 1911.
ERROR TO, AND APPEALS FROM, THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.
*363 Mr. John B. Stanchfield, with whom Mr. Louis S. Levy and Mr. William M. Parke were on the brief, for plaintiff in error and appellant.
The Solicitor General, with whom Mr. Henry E. Colton, Special Assistant to the Attorney General, was on the brief, for the United States.
*366 MR. JUSTICE HUGHES delivered the opinion of the court.
These three cases involve the same question. The first is a writ of error to the Circuit Court to review a judgment committing the plaintiff in error for contempt. The second is an appeal from an order of the Circuit Court dismissing a writ of habeas corpus sued out after such commitment. *367 The third is an appeal from an order dismissing a writ of habeas corpus by which a discharge was sought from a later commitment for a similar contempt.
The contempt consisted in the refusal of the plaintiff in error and appellant, Christopher C. Wilson, to permit the inspection by a grand jury of letter press copy books in his possession. The books belonged to a corporation of which he was president and were required to be produced by a subpoena duces tecum.
The circumstances were these: The grand jury empannelled in the Circuit Court for some time had been inquiring into alleged violations of §§ 5440 and 5480 of the United States Revised Statutes by Wilson and others. Wilson was the president of the United Wireless Telegraph Company, a corporation organized under the laws of the State of Maine. On August 3, 1910, the grand jury found two indictments against him and certain officers, directors and stockholders of this corporation, the one charging fraudulent use of the mails and the other a conspiracy for such use. The grand jury continued its investigations and on October 7, 1910, a subpoena duces tecum was issued (set forth in the margin[1]), which was directed to the *368 United Wireless Telegraph Company, requiring its appearance before the grand jury and the production by it of the letter press copy books of the company "containing copies of letters and telegrams signed or purporting to be signed by the President of said company during the month of May and June, 1909; in regard to an alleged violation of the statutes of the United States by C.C. Wilson."
Service was made upon the company by service upon Wilson, as president, and upon its secretary and two directors. On the return day Wilson appeared before the grand jury, and in response to questions, when not under oath, stated that he answered the call of the United Wireless Telegraph Company and declined to answer further questions until he was sworn; and having been sworn, and being asked whether or not the company produced the letter press copy books called for, he filed a written statement in which, after describing the subpoena, he said:
"III. Said letter press copy books for the months of May and June, 1909, in said subpoena mentioned during said months of May and June, 1909, were kept regularly in my office as President of said corporation, and were regularly used by me and for the most part, if not entirely, by me only, and contained copies of my personal and other correspondence, as well as copies of the correspondence relating to the business and affairs of said corporation. For the greater part of the time during and since May and June, 1909, and all the time during the last month and *369 more, said letter press copy books have been and still are in my possession, custody and control, and as against any other officer or employe of said corporation, or any other person, I have been entitled to such possession, custody and control. I did not secure and have not at any time held possession of said letter press copy books in anticipation that any subpoena for their production would be served upon me or said corporation, or for the purpose of evading any subpoena or other legal process which might be served upon me or said corporation."
He alleged that he was the "C.C. Wilson" mentioned in the subpoena as the one against whom the inquiry was directed, and described the pending indictments. He stated that the letter press copy books were essential to the preparation of his defense and that he was using them for that purpose; that he believed that the matters therein contained would tend to incriminate him; and that he "should not be compelled, directly or indirectly, to furnish or produce said letter press copy books as called for by said subpoena," nor to testify in regard to their contents, nor permit them to be used against him. He added that he had the books with him, but that he declined to deliver them to the grand jury, insisting that his refusal was in entire good faith.
The grand jury presented the matter to the court and Wilson was adjudged to be in contempt and was committed to the custody of the marshal "until he shall cease to obstruct and impede the United Wireless Telegraph Company from complying with the subpoena duces tecum attached to the above mentioned presentment, or otherwise purge himself from this contempt." This is the judgment which is the subject of review in the first case (No. 759).
Wilson then petitioned for a writ of habeas corpus alleging that the commitment was illegal for the reasons (1) that the court was without jurisdiction to entertain *370 the charge of contempt, (2) that there was no "cause" or "action" pending in the court between the United States and any party mentioned in the subpoena, in which the petitioner could be required to testify or give evidence, (3) that the grand jury was not in the exercise of its legitimate authority in prosecuting the investigation set out in the presentment, its powers being limited to the investigation of specific charges against particular persons, and (4) that the subpoena was illegal, unauthorized and void because it did not comply with § 877 of the United States Revised Statutes in that it required the person addressed to appear and not to attend, and did not require the person addressed "to testify generally" in behalf of the United States; and because it was not issued pursuant to an order of court, was addressed to the corporation without mention of any individual or officer, and would not apprise the defendant in the prosecution which might follow of the name of the precise witness who might have appeared against him.
It was further urged, reiterating in substance what had been said to the grand jury, that the petitioner should not be held in contempt as the subpoena was not directed to him, but merely to the corporation; and generally that the proceedings were in violation of his rights under the Fourth and Fifth Amendments to the Constitution of the United States.
The writ was issued and on return being made of the commitment was dismissed and the petitioner remanded, and from this order an appeal was taken to this court (No. 760).
Later, on October 28, 1910, another subpoena duces tecum was issued in the same form, addressed to the United Wireless Telegraph Company, and calling for the same books. It was served on the appellant Wilson and also on the secretary and five directors of the company. On the return day, they appeared before the grand jury, *371 the appellant Wilson then having in his possession a letter press copy book which the subpoena described, but upon demand being made it was not produced before the grand jurors for their inspection. The foreman then directed the production of the books on the following day, when the same persons again appeared, Wilson still having the book above mentioned, and the demand and refusal were repeated.
Thereupon the grand jury through the District Attorney made an oral presentment to the court, in the presence of Wilson and the others who had been served with the subpoena, that the corporation and its officers and directors were in contempt, and specifically with respect to Wilson that he was "preventing the corporation from complying with the process." On behalf of the directors before the court it was stated that they had made efforts to obtain the books for production before the grand jury, but that Wilson had declined to surrender them. They presented the minutes of a meeting of the board of directors held on that day at which these directors, constituting a majority of the board, had passed a resolution demanding of Wilson the possession of the letter press copy books called for by the subpoena "for the production of the same before the Federal Grand Jury." The court again adjudged Wilson to be in contempt and ordered his commitment "until he delivers to the United Wireless Telegraph Company the said books called for by said subpoena, and ceases to obstruct and impede the process of this Court, or otherwise purge himself of this contempt." A writ of habeas corpus was then issued upon a petition alleging the same objections to the subpoena and commitment which had been set forth in the petition for the former writ. On return the writ was dismissed and the petitioner appealed (No. 788).
We may first consider the objections to the validity of the subpoena and then the claim of privilege.
*372 The objections to the jurisdiction on the ground that there was no "cause" or "specific charge" pending before the grand jury were made and answered in Hale v. Henkel, 201 U.S. 43, and require no further examination.
But the question is also presented whether the subpoena was unauthorized, and hence void, because it was not directed to an individual, but to a corporation. It is urged that its form was unusual and unwarranted, in that it did not require any one to attend and to testify, but simply directed a corporation, which could not give oral testimony, to produce books.
While a subpoena duces tecum ordinarily contains the ad testificandum clause, this cannot be regarded as essential to its validity. The power to compel the production of documents is, of course, not limited to those cases where it is sought merely to supplement or aid the testimony of the person required to produce them. The production may be enforced independently of his testimony, and it was held long since that the writ of subpoena duces tecum was adquate for this purpose. As was said by Lord Ellenborough in Amey v. Long, 9 East, 484, "The right to resort to means competent to compel the production of written, as well as oral, testimony seems essential to the very existence and constitution of a Court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed with due effect without them." Where the subpoena duces tecum contains the usual ad testificandum clause, still it is not necessary for the party requiring the production to have the person producing the documents sworn as a witness. They may be proved by others. 3 Wigmore on Evidence, §§ 1894, 2200; Davis v. Dale, M. & M. 514; Summers v. Moseley, 2 Cr. & M. 477; Rush v. Smith, 1 C.M. & R. 94; Perry v. Gibson, 1 A. & E. 48; Martin v. Williams, 18 Alabama, 190; Treasurer v. Moore, 3 Brev. (S. Car.), 550; *373 Sherman v. Barrett, McMull. (S. Car.), 163; Aiken v. Martin, 11 Paige, 499; Note, 15 Fed. Rep. 726.
"I always thought," said Parke, J., in Perry v. Gibson, supra, "that a subpoena duces tecum had two distinct objects, and that one might be enforced without the other." In Summers v. Moseley, supra, the function of the writ was carefully considered and the judgment was rendered after consultation with the judges of the other courts. It was argued that "the duces tecum part of the writ is only compulsory as ancillary to the ad testificandum part." But the reasoning of the court negatived the contention; and it was ruled that the person subpoenaed was "compellable to produce the document in his possession without being sworn, the party calling upon him to produce it not having occasion to ask him any question." Bayley, B., said: "The origin of the subpoena duces tecum does not distinctly appear. It has been said on the part of the defendant that it was not introduced or known in practice till the reign of Charles the Second, and it may be that in its present form the subpoena duces tecum was not known or made use of until that period; but no doubt can be entertained that there must have been some process similar to the subpoena duces tecum to compel the production of documents, not only before that time, but even before the statute of the 5th of Elizabeth. Prior to that statute, there must have been a power in the crown (for it would have been utterly impossible to carry on the administration of justice without such power) to require the attendance in courts of justice of persons capable of giving evidence, and the production of documents material to the cause, though in the possession of a stranger. The process for that purpose might not be called a subpoena duces tecum, but I may call it a subpoena to produce; the party called upon in pursuance of such a process not as a witness, but simply to produce, would do so or not, and if he did not, I can entertain no doubt that *374 it would have been open to the party for whom he was called to make an application to the court in the ensuing term to punish him for his contempt in not producing the document in obedience to such subpoena. Whether he could require to be sworn not ad testificandum, but true answer to make to such questions as the court should demand of him touching the possession or custody of the document, is not now the question. Perhaps he might; but we are clearly of opinion that he has no right to require that a party bringing him into court for the mere purpose of producing a document should have him sworn in such a way as to make him a witness in the cause, when it may often happen that he is a mere depository, and knows nothing of the documents of which he has the custody."
Treating the requirement to produce as separable from the requirement to testify generally what one knows in the cause, it follows that the latter may be omitted from the subpoena without invalidating the former. This course does not impair any right either of the opposing party or of the person responding to the subpoena. The latter may still have the opportunity to which he has been held entitled (Aiken v. Martin, supra), of showing under oath the reasons why he should not be compelled to produce the document. For this right does not depend upon the ad testificandum clause, but is incident to the requirement to produce.
Where the documents of a corporation are sought the practice has been to subpoena the officer who has them in his custody. But there would seem to be no reason why the subpoena duces tecum should not be directed to the corporation itself. Corporate existence implies amenability to legal process. The corporation may be sued; it may be compelled by mandamus, and restrained by injunction, directed to it. Possessing the privileges of a legal entity, and having records, books and papers, it is under *375 a duty to produce them when they may properly be required in the administration of justice.
There is no merit in the appellant's contention with respect to the application of § 877 of the United States Revised Statutes. The provision of the section that witnesses required on the part of the United States shall be subpoenaed "to attend to testify generally on their behalf, and not to depart the court without leave thereof, or of the district attorney," is in the interest of convenient and economical administration and has no bearing upon the questions here involved. It is said that, under the form of writ used in this case, the defendant in the prosecution which might follow an indictment by the grand jury would not be apprised of the name of the precise witness who might have appeared against him, and § 829 of the Revised Statutes and the Sixth Amendment of the Federal Constitution are invoked. The contention ignores the fact that the writ calls for books and not for oral testimony; and, aside from this, neither the constitutional provision nor the statute accords the right to be apprised of the names of the witnesses who appeared before the grand jury. Even in cases of treason and other capital offenses, under § 1033 of the Revised Statutes, the required list of witnesses is only of those who are to be produced on the trial. Logan v. United States, 144 U.S. 263, 304; United States v. Curtis, 4 Mason, 232; Balliet v. United States, 129 Fed. Rep. 692.
Nor was the process invalid under the Fourth Amendment. The rule laid down in the case of Boyd v. United States, 116 U.S. 616, is not applicable here. In that case, an information for the forfeiture of goods under the Customs Act of June 22, 1874, c. 391, 18 Stat. 187, it was held that the enforced production "of the private books and papers" of the owner of the goods sought to be forfeited, under the provisions of § 5 of that act, was "compelling him to be a witness against himself within the *376 meaning of the Fifth Amendment" and was also "the equivalent of a search and seizure  and an unreasonable search and seizure  within the meaning of the Fourth Amendment." But there is no unreasonable search and seizure, when a writ, suitably specific and properly limited in its scope, calls for the production of documents which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced. In the present case, the process was definite and reasonable in its requirements, and it was not open to the objection made in Hale v. Henkel, supra (pp. 76, 77). Addressed to the corporation, and designed to enforce its duty, no ground appears upon which the corporation could have resisted the writ. And the corporation made no objection of any sort. The appellant did not attempt to assert any right on its part; his conduct was in antagonism to the corporation, so far as its attitude is shown. A majority of the directors, not including the appellant, appeared before the court and urged their solicitude to comply with the writ. They presented their formal action, taken at a meeting of the board, in which they demanded of the appellant the delivery of the books for production before the grand jury.
Concluding, then, that the subpoena was valid and that its service imposed upon the corporation the duty of obedience, there can be no doubt that the appellant was likewise bound by it unless, with respect to the books described, he could claim a personal privilege. A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt. The applicable principle was thus stated by Chief Justice *377 Waite in Commissioners v. Sellew, 99 U.S. 624, 627, where a peremptory mandamus was directed against a municipal board: "As the corporation can only act through its agents, the courts will operate upon the agents through the corporation. When a copy of the writ which has been ordered is served upon the clerk of the board, it will be served on the corporation, and be equivalent to a command that the persons who may be members of the board shall do what is required. If the members fail to obey, those guilty of disobedience may, if necessary, be punished for the contempt. Although the command is in form to the board, it may be enforced against those through whom alone it can be obeyed. . . . While the board is proceeded against in its corporate capacity, the individual members are punished in their natural capacities for failure to do what the law requires of them as the representatives of the corporation." See also Leavenworth v. Kinney, 154 U.S. 642; People v. Sturtevant, 9 N.Y. 277.
The appellant asserts his privilege against self-crimination. There is no question, of course, of oral testimony, for he was not required to give any. Undoubtedly it also protected him against the compulsory production of his private books and papers. Boyd v. United States, supra; Bollman v. Fagin, 200 U.S. 195. But did it extend to the corporate books?
For there can be no question of the character of the books here called for. They were described in the subpoena as the books of the corporation, and it was the books so defined which, admitting possession, he withheld. The copies of letters written by the president of the corporation in the course of its transactions were as much a part of its documentary property, subject to its control and to its duty to produce when lawfully required in judicial proceedings, as its ledgers and minute books. It was said in the appellant's statement before the grand jury that the books contained copies of his "personal *378 and other correspondence as well as copies of the correspondence relating to the business and affairs" of the corporation. But his personal letters were not demanded; these the subpoena did not seek to reach; and as to these no question of violation of privilege is presented. Plainly he could not make these books his private or personal books by keeping copies of personal letters in them. Had the appellant merely sought to protect his personal correspondence from examination, it would not have been difficult to have provided, under the supervision of the court, for the withdrawal of such letters from scrutiny. Indeed, on the hearing of the second presentment, the court suggested their removal from the books. But the appellant was not content with protection against the production of his private letters; he claimed the privilege to withhold the corporate books and the documents which related to corporate matters and with respect to which he had acted in his capacity as the executive officer of the corporation. And that is the right here asserted.
It is at once apparent that the mere fact that the appellant himself wrote, or signed, the official letters copied into the books, neither conditioned nor enlarged his privilege. Where one's private documents would tend to incriminate him, the privilege exists although they were actually written by another person. And where an officer of a corporation has possession of corporate records which disclose his crime, there is no ground upon which it can be said that he will be forced to produce them if the entries were made by another, but may withhold them if the entries were made by himself. The books are no more his private books in the latter case than in the former; if they have been held pursuant to the authority of the corporation, that authority is subject to termination. In both cases production tends to criminate; and if requiring him to produce compels him to be a witness against himself in the one case it does so equally in the *379 other. There are other facts which serve to sharpen the claim of privilege, but are not determinative. Thus, there were two indictments pending against the appellant, and the inquiry before the grand jury was also directed against him. If, however, the privilege existed with respect to these books in his hands, it would have been likewise available had there been no prior indictments and had the immediate investigation concerned violations of law by others. The privilege holds although the pursuit of the person required to produce has not yet begun; it is the incriminating tendency of the disclosure and not the pendency of the prosecution against the witness upon which the right depends. Counselman v. Hitchcock, 142 U.S. 562, 563.
We come then to the broader contention of the appellant,  thus stated in the argument of his counsel: "An officer of a corporation who actually holds, the physical possession, custody and control of books or papers of the corporation which he is required by a subpoena duces tecum to produce, is entitled to the same protection against exposing the contents thereof which would tend to incriminate him, as if the books and papers were absolutely his own." That is, the power of the courts to require their production depends not upon their character as corporate books and the duty of the corporation to submit them to examination, but upon the particular custody in which they may be found. If they are in the actual custody of an officer whose criminal conduct they would disclose, then, as this argument would have it, his possession must be deemed inviolable, and, maintaining the absolute control which alone will insure protection from their being used against him in a criminal proceeding, he may defy the authority of the corporation whose officer or fiduciary he is and assert against the visitatorial power of the State, and the authority of the Government in enforcing its laws, an impassable barrier.
*380 But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held. It may yet appear that they are of a character which subjects them to the scrutiny demanded and that the custodian has voluntarily assumed a duty which overrides his claim of privilege. This was clearly implied in the Boyd Case where the fact that the papers involved were the private papers of the claimant was constantly emphasized. Thus, in the case of public records and official documents, made or kept in the administration of public office, the fact of actual possession or of lawful custody would not justify the officer in resisting inspection, even though the record was made by himself and would supply the evidence of his criminal dereliction. If he has embezzled the public moneys and falsified the public accounts he cannot seal his official records and withhold them from the prosecuting authorities on a plea of constitutional privilege against self-crimination. The principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established. There the privilege, which exists as to private papers, cannot be maintained.
There are abundant illustrations in the decisions. Thus in Bradshaw v. Murphy, 7 C. & P. 612, it was held that a vestry clerk who was called as a witness could not on the ground that it might incriminate himself object to the production of the vestry books kept under the statute, 58 George III, chapter 69, § 2. In State v. Farnum, 73 S. Car. 165, it appeared that a legislative committee had been appointed to investigate the affairs of the State Dispensary, and it was provided that it should have access to *381 all books of the institution or of any officer or employe thereof. In anticipation the state dispenser removed certain books from the files, defending his action on the plea that they contained private matter which the committee had no right to inspect. The court ruled that it was the "obvious duty of any officer to keep books, letters and other documents relating to the business of his office and to the manner in which he has discharged or failed to discharge its duties in the place where the public business with which he is charged is conducted, subject to examination by any of the committees appointed by the General Assembly, and upon an application for mandamus to compel him to perform this obvious public duty, it is essential for the court to ascertain the facts and inform itself whether there has been an actual removal of public documents or other public property and a refusal to restore them for examination." In State v. Donovan, 10 N. Dak. 203, the defendant was a druggist who was required by statute to keep a record of all sales of intoxicating liquors made by him, which should be subject to public inspection at reasonable times. It was held that the privilege against self-crimination was not available to him with respect to the books kept under the law, for they were "public documents, which the defendant was required to keep, not for his private uses, but for the benefit of the public, and for public inspection." On similar grounds in State v. Davis, 108 Missouri, 666, the court sustained a statute requiring druggists to preserve the prescriptions they compounded and to produce them in court when required. See also State v. Davis, 69 S.E. Rep. (W. Va.) 639; People v. Coombs, 158 N.Y. 532; L. & N.R.R. Co. v. Commonwealth, 51 S.W. Rep. (Ky.) 167; State v. Smith, 74 Iowa, 580; State v. Cummins, 76 Iowa, 133; People v. Henwood, 123 Michigan, 317; Langdon v. People, 133 Illinois, 382.
The fundamental ground of decision in this class of *382 cases, is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection.
What then is the status of the books and papers of a corporation, which has not been created as a mere instrumentality of government, but has been formed pursuant to voluntary agreement and hence is called a private corporation? They are not public records in the sense that they relate to public transactions, or, in the absence of particular requirements, are open to general inspection or must be kept or filed in a special manner. They have reference to business transacted for the benefit of the group of individuals whose association has the advantage of corporate organization. But the corporate form of business activity, with its chartered privileges, raises a distinction when the authority of government demands the examination of books. That demand, expressed in lawful process, confining its requirements within the limits which reason imposes in the circumstances of the case, the corporation has no privilege to refuse. It cannot resist production upon the ground of self-crimination. Although the object of the inquiry may be to detect the abuses it has committed, to discover its violations of law and to inflict punishment by forfeiture of franchises or otherwise, it must submit its books and papers to duly constituted authority when demand is suitably made. This is involved in the reservation of the visitatorial power of the State, and in the authority of the National Government where the corporate activities are in the domain subject to the powers of Congress.
This view, and the reasons which support it, have so *383 recently been stated by this court in the case of Hale v. Henkel, supra, that it is unnecessary to do more than to refer to what was there said (pp. 74, 75):
"Conceding that the witness was an officer of the corporation under investigation, and that he was entitled to assert the rights of the corporation with respect to the production of its books and papers, we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the State. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is unlimited. He owes no duty to the State or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to criminate him. He owes no such duty to the State, since he receives nothing therefrom, beyond the protection of his life and property. His rights are such as existed by the law of the land long antecedent to the organization of the State, and can only be taken from him by due process of law, and in accordance with the Constitution. Among his rights are a refusal to incriminate himself, and the immunity of himself and his property from arrest or seizure except under a warrant of the law. He owes nothing to the public so long as he does not trespass upon their rights.
"Upon the other hand, the corporation is a creature of the State. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the State and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the legislature to investigate *384 its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a State, having chartered a corporation to make use of certain franchises, could not in the exercise of its sovereignty inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose. The defense amounts to this: That an officer of a corporation, which is charged with a criminal violation of the statute, may plead the criminality of such corporation as a refusal to produce its books. To state this proposition is to answer it. While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privileges.
". . . Being subject to this dual sovereignty, the General Government possesses the same right to see that its own laws are respected as the State would have with respect to the special franchises vested in it by the laws of the State. The powers of the General Government in this particular in the vindication of its own laws, are the same as if the corporation had been created by an act of Congress. It is not intended to intimate, however, that it has a general visitatorial power over state corporations." See also Consolidated Rendering Co. v. Vermont, 207 U.S. 541; Hammond Packing Co. v. Arkansas, 212 U.S. 322, pp. 348, 349.
The appellant held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and if he were implicated in the violations of law, he could not withhold the books to protect himself from the effect of their disclosures. The reserved power of visitation would seriously be embarrassed, if not wholly defeated in *385 its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion. It would not be a recognition, but an unjustifiable extension, of the personal rights they enjoy. They may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers. But the visitatorial power which exists with respect to the corporation of necessity reaches the corporate books without regard to the conduct of the custodian.
Nor is it an answer to say that in the present case the inquiry before the grand jury was not directed against the corporation itself. The appellant had no greater right to withhold the books by reason of the fact that the corporation was not charged with criminal abuses. That, if the corporation had been so charged, he would have been compelled to submit the books to inspection, despite the consequences to himself, sufficiently shows the absence of any basis for a claim on his part of personal privilege as to them; it could not depend upon the question whether or not another was accused. The only question was whether as against the corporation the books were lawfully required in the administration of justice. When the appellant became president of the corporation and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. If another took his place his custody would yield. He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize.
We have not overlooked the early English decisions to *386 which our attention has been called (Rex v. Purnell, 1 W. Bl. 37; Rex v. Granatelli, 7 State Tr. N.S. 979; see also Rex v. Cornelius, 2 Stra. 1210), but these cannot be deemed controlling. The corporate duty, and the relation of the appellant as the officer of the corporation to its discharge, are to be determined by our laws. Nothing more is demanded than that the appellant should perform the obligations pertaining to his custody and should produce the books which he holds in his official capacity in accordance with the requirements of the subpoena. None of his personal papers are subject to inspection under the writ and his action, in refusing to permit the examination of the corporate books demanded, fully warranted his commitment for contempt.
The judgment and orders of the Circuit Court are
Affirmed.
MR. JUSTICE McKENNA dissenting.
I am unable to concur with my brethren, and if the application of a constitutional provision, indeed a constitutional provision whose purpose is the protection of personal liberty, were not involved I might not even signify opposition. The application of the Constitution of the United States, especially as it may affect personal privileges, is the most serious duty of the court. It is sure to have consequence beyond the instance, and justifies the expression of the views a member of the court may have about it.
The facts are stated in the opinion, but they are not all of equal significance, indeed may confuse unless distinguished. I put to one side, therefore, all consideration of the process by which the letter-press books were brought into court or before the grand jury. They were taken there, of course, in deference  in submission, it may be better to say  to the command of the law expressed in the subpoena. *387 Resistance to that was not offered by Wilson, nor was it necessary. Boyd v. United States, 116 U.S. 616. His constitutional right was asserted afterwards. With Wilson then and the books in his possession we have to deal and the rights he had in such situation, and let us keep in mind that it was his guilt under the law that was under investigation and which the books were sought for the purpose of exposing. Three indictments had already been found against him. Crime, therefore, had been formally charged, and further crime was being investigated  not crime by the corporation, but crime by him, and the proof, it was supposed, lay in the books. They were sought for no other reason. They were demanded of him to convict him. To the demand he answered that the Constitution of his country protected him from producing evidence against himself. And he was certainly asked to produce such evidence. The books were in his possession in an assertion of right over them against everybody. In the transactions they recorded he was a participant, and, it may be, the only doer. It is made something of in the opinion that the corporation was willing to have the books surrendered. The more unmistakable, therefore, was the claim of Wilson a personal privilege. And let it be kept in mind that it was his own privilege that he claimed, not that of the corporation; and I pass by as irrelevant a consideration of what disclosures could have been required of it, even if it had been accused of crime and there had been pending an inquiry against it.
Upon what ground was the privilege denied? Upon the ground that the books were not his property but that of the corporation, and they are assimilated in the opinion to public documents, a consideration I pass for the present. How far, as affecting the privilege, is the rule of the title to property to be carried? Every rule may be tested by what can be done under it. Whenever a privilege is claimed against the production of books, or, of course other *388 property, may an issue be raised as to title and upon its decision by the court the right to the privilege be determined, or shall the rule only be applied when such issue is not made? And what of partnership property, or property otherwise owned in common? Does the degree of interest affect the rule? In the case at bar Wilson asserted the right to hold the books against the corporation. However, such considerations are, in my view, of minor importance, and I instance them only to show to what uncertainties we may go when we leave the clear and simple directness of the privilege against self-incrimination. As the privilege is a guaranty of personal liberty it should not be qualified by construction and a distinction based on the ownership of the books demanded as evidence is immaterial. Such distinction has not been regarded except in the case of public records, as will be exhibited by a review of the authorities.
In Rex. v. Granatelli, Reports of State Trials, New Series, 979, 986, Prince Granatelli was prosecuted for breach of the Foreign Enlistment Act in fitting out certain vessels to be used in hostilities against the King of the Two Sicilies. A witness was subpoenaed to produce an agreement whereby Granatelli agreed to buy the vessels of a certain navigation company of which the witness was the secretary. The witness refused to produce it, on the ground that it might contain matter that might criminate himself or other parties for whom he was interested. It was ruled that he could not be compelled to produce the agreement.
In Rex v. Cornelius, 2 Strange, 1210, an information was granted against the defendants, who were justices of the peace, for taking money for granting licenses to alehouse keepers. A rule was applied for to inspect the books of the corporation. It was refused, on the ground that it would in effect oblige a defendant indicted for misdemeanor to furnish evidence against himself.
*389 In Rex v. Purnell, 1 W. Bl. 37, an information was exhibited against the defendant, who was the Vice Chancellor of Oxford, for neglect of his duty in not punishing certain persons who had spoken treasonable words in the streets of Oxford. The Attorney General moved for a rule directed to the proper officers of the university to permit their books and archives to be inspected to furnish evidence against the defendant. The motion was attempted to be supported "on a suggestion that the King, being a visitor of the university, had a right to inspect their books whenever he thought proper." It was argued besides that "when a man is a magistrate, and as such has books in his custody, his having the office shall not secrete those books which another Vice Chancellor must have produced." The rule was refused, the court saying: "We know no instance wherein this court has granted a rule to inspect books in a criminal prosecution nakedly considered." The corporations in those cases were considered as private, as observed by Wigmore on Evidence, notes to § 2259. For the same reason, in Rex v. Worsenham, 1 Ld. Raym. 705, the production of custom-house books in an information against custom-house officers for forging a custom-house bond were not compelled. And in Regina v. Mead, 2 Ld. Raym. 927, books of the defendant who, with eight others, were incorporated as highway surveyors, being considered of a private nature, were not required to be produced. Such corporations would, no doubt, be regarded to-day as public, as observed by Wigmore, and he cites cases in which certain records were deemed public, as follows: In a libel suit a parish vestry book required by statute to be kept; registered pharmacist's reports filed as required by law; in a criminal prosecution for unlawful railroad charges, a tariff sheet publicly posted; a druggist's record of sales kept under a statute to charge him with illegal liquor selling. By a statute in Massachusetts, "no official paper *390 or record" produced by a witness at a legislative hearing is to be within the privilege against self-crimination.
As a deduction from the cases I have cited the rule is laid down in Wigmore on Evidence to be: "Where the corporation's misconduct involves also the claimant's misconduct, or where the document is in reality the personal act of the claimant, though nominally that of the corporation, the disclosures are virtually his own, and to that extent his privilege protects him from producing them."
It would unduly extend this opinion to review the cases which are said to oppose Wigmore's deduction, but as Hale v. Henkel, 201 U.S. 43, is cited in the opinion of the court, I will refer to it briefly.
It was there held that an officer of a corporation could not refuse to produce its books on the ground that they would criminate the corporation. What privilege an officer of the corporation had from producing the books on the ground that they might criminate him was not necessary to decide, as immunity from prosecution was given by statute for any matter as to which he should testify. It may be contended that it is a natural inference from the decision that but for the immunity granted he could have claimed such privilege. See also Nelson v. United States, 201 U.S. 92. Circuit Judge Gilbert, in a well-considered opinion in Ex parte Chapman, 153 Fed. Rep. 153, made such deduction from Hale v. Henkel, and discharged Chapman from custody to which he had been committed for refusing to produce for the inspection of a grand jury the books and papers belonging to a corporation of which he was an officer.
The weight of authority, therefore, is against the power of a court to compel the production of books of a private corporation by any one whom they would criminate. And the cases seem right on principle. The spirit of the privilege is that a witness shall not be used in any way to his crimination. When that may be the effect of any evidence *391 required of him, be it oral or documentary, he may resist. He cannot be made use of at all to secure the evidence. This must necessarily be the extent of the privilege. Rex v. Purnell, supra, is specially in point. The Solicitor General for the crown, replying to the objection that no one was bound to furnish evidence against himself, said, "Agreed, but a distinction may be made. When a man is a magistrate, and as such has books in his custody, his having the office shall not secrete those books, which another Vice Chancellor must have produced. Besides, the statutes are not in the Vice Chancellor's custody only, but also in the hands of the Custos Archivorum."
And the constitutional protection is not measured by the effect, great or small, on the prosecution. It may be invoked even though the prosecution may be defeated. It is the contemplation of the provision of the Constitution that such may be the result and that it is less evil than requiring a person to aid in his conviction of crime.
Neither plausible arguments therefore nor considerations of expediency should prevail against or limit a principle deemed important enough to be made constitutional. Such a principle should be adhered to firmly. It is said in Boyd v. United States, 116 U.S. 616, 635, that "constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis."
In a case of seizure and forfeiture of certain property under the customs-revenue laws for fraudulent invoicing, Boyd entered a claim for the property. Before the trial it became important to know the quantity and value of the property. In obedience to an order issued by the court *392 under a statute of the United States, Boyd produced the invoice of the property, but objected to inspection, on the ground that in a suit for forfeiture no evidence can be compelled from the claimants, and also that the statute, so far as it compelled production of the evidence to be used against him, was unconstitutional and void. It was held that the order of the court and the statute violated both the Fourth and Fifth Amendments of the Constitution of the United States, notwithstanding that the statute could trace its purpose back to one passed in 1863, which had been sustained by decisions in the Circuit and District Courts, and notwithstanding it also had been sustained by such decisions. The case has been criticised, but it has endured and has become the foundation of other decisions. Indeed, eminent legal names may be cited in criticism, if not ridicule, of the policy expressed by the Fifth Amendment, that is, the policy of protection against self-crimination. It is declared to have no logical relation to the abuses that are said to sustain it, and that the pretense for it, so far as based on hardship, is called an "old woman's reason," (also a "lawyer's reason,") and a "double distilled and treble refined sentimentality." So far as based on unfairness it is called "the fox hunter's reason," its basis being that a criminal and a fox must have a chance to escape, the subsequent pursuit being made thereby more interesting. And it is asked, supposing a witness upon the stand in a prosecution for robbery, "a question is put, the effect of which were he to answer it, might be to subject him to conviction in respect to another robbery, attended with murder (such high offenses give emphasis to the argument), on the ground of public utility and common sense is there any reason why the collateral advantage thus proffered by fortune to justice should be foregone?" Bentham on Judicial Evidence, vol. 5, page 229 et seq. A reply would be difficult if government had no other concern than the punishment of crime.
*393 If the Government had no other concern, short-cuts to conviction would be justified and commendable in proportion to their shortness. The general warrants which John Wilkes resisted were such a cut; so were writs of assistance issued in Colonial times. Their inducement was the detection of crime, and yet popular rights were vindicated in the resistance to the first, and the "child Independence was born" by resistance to the second.
I will not pause to vindicate the privilege of the Fifth Amendment against considerations of expediency nor to inquire whether it is a well-reasoned principle, one logically following from abuses, properly adapted to the facts of life when it was adopted, or if so then, not now. It has passed from polemics and has secured the sanction of constitutional law. Courts cannot change it, or add to it or take from it to suit the "condition of modern civilization," as it was suggested in a case submitted with this. It is as vital now as when ordained and is not uncertain. It is plain and direct as to the source of criminating evidence. The accused person cannot be made the source. What Lord Camden denominated "an argument of utility" should not prevail now as it did not in Westminster Hall when he pronounced his great judgment against general warrants. Indeed English courts, as I have shown, have never wavered nor felt constrained by the demands of criminal justice to depart from or qualify in any way the strength of the privilege. Is it possible that a written constitution is more flexible in its adaptations than an unwritten one, and that the spirit of English liberty is firmer or more consistent than that of American liberty, or discerns more clearly the danger of relaxing the strictness of any of the guarantees of personal rights?
A limitation by construction of any of the constitutional securities for personal liberty is to be deprecated. A people may grow careless and overlook at what cost and through what travail they acquired even the least of their liberties. *394 The process of deterioration is simple. It may even be conceived to be advancement, and that intelligent self-government can be trusted to adapt itself to occasion, not needing the fetters of a predetermined rule. It may come to be considered that a constitution is the cradle of infancy, that a nation grown up may boldly advance in confident security against the abuses of power and that passion will not sway more than reason. But what of the end when the lessons of history are ignored, when the barriers erected by wisdom gathered from experience are weakened or destroyed? And weakened or destroyed they may be when interest and desire feel their restraint. What then of the end; will history repeat itself? And this is not a cry of alarm. "Obsta principiis" was the warning of Mr. Justice Bradley in Boyd v. United States against the attempt of the Government to break down the constitutional privilege of the citizen by attempting to exact from him evidence of fraud against the customs laws. I repeat the warning. The present case is another attempt of the same kind and should be treated in the same way.
NOTES
[1] The President of the United States of America to United Wireless Telegraph Company, 42 Broadway, New York, N.Y., Greeting:
 [SEAL]

We command you, That all business and excuses being laid aside you appear before the Grand Inquest of the Body of the People of the United States of America for the Southern District of New York, at a Circuit Court to be held in the United States Court House and Post Office Building, Borough of Manhattan, City of New York, on the 10th day of October, 1910, at 11 o'clock in the forenoon, and that you produce at the time and place aforesaid, the following:
Letter press copy books of United Wireless Telegraph Company containing copies of letters and telegrams signed or purporting to be signed by the President of said company during the months of May and June, 1909; in regard to an alleged violation of the statutes of the United States by C.C. Wilson.
And for a failure to produce the aforesaid documents you will be deemed guilty of a contempt of Court, and liable to the penalties of the law.
Witness, the Honorable John M. Harlan, Senior Associate Justice of the United States, at the Borough of Manhattan, City of New York, the 7th day of October, 1910.
 JOHN A. SHIELDS,
 Clerk.
 HENRY WISE,
 U.S. Attorney.