UNITED STATES of America and Russell K. Ward, Special Agent, Internal Revenue Service, Petitioners,

v.

Harvey J. OSBORN, Respondent,

Ben Johnson et al., Intervenors.

No. 75–479.

United States District Court,
D. Oregon.

Nov. 6, 1975.

Sidney I. Lezak, U. S. Atty., William W. Youngman, Asst. U. S. Atty., Dist. of Oregon, Portland, Or., for petitioners.

Harvey J. Osborn, in pro per.

Clyde R. Maxwell, Newport Beach, Cal., and Norman Sepenuk, Portland, Or., for intervenors.

## OPINION

SKOPIL, District Judge.

This is a proceeding brought under sections 7402(b) and 7604(a) of the Internal Revenue Code to judicially enforce three Internal Revenue Service summonses. The summonses were served on August 9, 1974, upon Harvey J. Osborn, an attorney, to testify and to produce any documents relating to the federal income tax liabilities for the years 1969 through 1973 of three former clients—Ben Johnson, Sam Linder, and National Inventory Control Systems (NICS), a corporation. Johnson and Linder were shareholders, officers, and directors of NICS during this period. Osborn was also their personal attorney.

Osborn is no longer actively engaged in the practice of law. He has not represented these three clients in any legal matters since early 1973. He has retained his office files pertaining to his representation of them. He still considers himself their attorney with regard to matters on which he formerly represented them.

On September 10 and 13, 1974, Osborn appeared and testified in response to the summonses. He brought with him all his files. As to certain testimony and documents, Osborn refused to comply with the summonses, claiming attorney-client privilege or the client's privilege against self-incrimination.

Because of Osborn's refusal, a petition to enforce Internal Revenue Service summonses was filed on May 20, 1975. On August 13, 1975, the motion of Johnson, Linder, and NICS to intervene was granted. The taxpayers assert on their own behalf the attorney-client privilege and (except NICS) the privilege against self-incrimination.

The transcript of Osborn's testimony is 120 pages long. An analysis of his responses to specific questions in light of the claimed privileges would be exceedingly difficult. The petitioners have simplified my task by designating certain matters for which they request enforcement. I shall limit my consideration to those matters.

Following is a list of the eleven items specified by petitioners. The listing is largely derived from purported copies of statements sent by Osborn to his clients.

| Item | Subject | Transaction Date | Statement Date |
|---|---|---|---|
| 1 | Estate Planning | 1–21–71 | 5– 1–71 |
| 2 | Ben Johnson Trust Trust Agreements | 2–17–71 | 5– 1–71 |
| | | 4–12–71 | 5– 1–71 |
| | | 6–29–71 | 2–29–72 |
| | | 8–31–72 | 12–26–72 |
| | | 11–13–72 | 12–26–72 |
| 3 | Stock Redemption Agreement | 2–17–71 | 5– 1–71 |
| 4 | Two Wills | 2–17–71 | 5– 1–71 |
| 5 | Property Transaction | 4–13–71 | 5– 1–71 |
| | | 12–31–71 | 2–29–72 |
| | | 8– 3–72 | 12–26–72 |
| | | 8–14–72 | 12–26–72 |
| | | 8–31–72 | 12–26–72 |
| | | 10–17–72 | 12–26–72 |
| | | 10–18–72 | 12–26–72 |
| | | 11–13–72 | 12–26–72 |
| | | 11–17–72 | 12–26–72 |
| 6 | Ben Johnson Insurance Co. | 4–19–71 | 5– 1–71 |
| | | 6– 9–71 | 2–29–72 |
| | | 6–15–71 | 2–29–72 |
| | | 7– 7–71 | 2–29–72 |
| | | 7– 8–71 | 2–29–72 |
| | | 7–20–71 | 2–29–72 |
| | | 8– 5–71 | 2–29–72 |
| | | 8–23–71 | 2–29–72 |
| 7 | World Computer Corporation | 9–13–71 | 2–29–72 |
| | | 1–31–72 | 2–29–72 |
| | | 10– 5–72 | 12–26–72 |
| | | 11–17–72 | 12–26–72 |
| | | 11–21–72 | 12–26–72 |
| 8 | Ben-Frank Co. | 11–13–72 | 12–26–72 |
| 9 | All statements of services performed for or mailed to NICS by Mr. Osborn for the period 1–1–69 through 12–31–73, excluding those statements on hand dated 3–1–70, 4–1–70, 7–1–70, 12–1–70, 5–1–71, 2–29–72, 12–26–72, and 12–31–72. | | |
| 10 | All ledger sheets pertaining to National Inventory Control Systems for the period 1–1–69 through 12–31–73. | | |
| 11 | Air Conditioners | 6– 3–71 | 2–29–72 |

1. Intervenors' Memorandum of Points and Authorities, filed August 27, 1975, specifically claims the attorney-client privilege only with respect to items 1, 4, and 10. That memorandum was submitted before individual documents had been designated for *in camera* inspection, however. I find that intervenors

As to items 1 through 8 and item 10, intervenors have asserted the attorney-client privilege and/or the privilege against self-incrimination.[1] They claim no knowledge as to item 11. They point out that Osborn previously testified (Q–28 to 31 of the transcript) that he has none of the statements described in item 9.

Following a hearing on September 3, 1975, Osborn submitted to the court for *in camera* inspection all the previously undisclosed documents. The documents furnished pertain to items 1, 2, 3, 5, 6, 7, and 10. No documents were supplied as to items 4, 8, 9, or 11. Osborn reported no files or documents available as to item 4, no files or information available as to item 8, no statements available as to item 9, and no file or other information available as to item 11.

Because of the responses of intervenors and Osborn, I need not consider whether Osborn should produce or testify as to items 9 and 11, nor need I consider whether Osborn should produce any documents relating to items 4 and 8. I must decide whether Osborn should be required to produce documents pertaining to items 1, 2, 3, 5, 6, 7, and 10 and whether he should be required to testify as to those items and items 4 and 8.

## ATTORNEY–CLIENT PRIVILEGE

Prior to adoption of the new Federal Rules of Evidence, the Ninth Circuit held that the attorney-client privilege must be resolved on the basis of state law. *United States v. Cromer,* 483 F.2d 99, 101 (9th Cir. 1973); *Baird v. Koerner,* 279 F.2d 623, 632 (9th Cir. 1960). Under Rule 501, Fed.R.Evid., effective July 1, 1975, such questions are generally governed by the "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience". Intervenors' have not waived any privilege available to them but, to the contrary, have consistently sought to assert whichever privilege applied. I have therefore considered as to each item whether either the attorney-client privilege or the privilege against self-incrimination is applicable.

claims of privilege will be considered in accordance with this rule.

■ The case most frequently cited for a statement of the requirements for invocation of the attorney-client privilege is *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–359 (D.Mass.1950):

> "The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

A somewhat similar formulation of the privilege is found in 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961):

> "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."

I decide intervenors' claims upon these general principles. The discussion below is limited to specific documents produced for inspection and specific questions asked of Osborn. The same principles shall apply to any further testimony which may be elicited from Osborn.

### Item 1: Estate Planning

■ The only document, Exhibit Z, submitted by Osborn for *in camera* inspection is a letter from him to Johnson dated February 23, 1971. I find that this letter is protected from disclosure by the attorney-client privilege. The privilege extends to confidential communications from attorney to client as well as to such communications from client to attorney:

> "That the *attorney's communications to* the client are also within the privilege was always assumed in the earlier cases and has seldom been brought into question. The reason for it is not any design of securing the attorney's freedom of expression, but the necessity of preventing the use of his statements as admissions of the client . . . ., or as leading to inferences of the tenor of the client's communications . . . ." 8 Wigmore, Evidence § 2320 (McNaughton rev. 1961)

### Item 2: Ben Johnson Trust

The only document submitted is the same letter described in item 1 above. That letter is privileged.

### Item 3: Stock Redemption Agreement

Osborn submitted two files, designated Exhibits A and B. The first file contains four documents and the second contains one document.[2]

■ The first document in the file designated Exhibit A is a stock redemption agreement executed on December 15, 1971, between NICS and Mrs. Johnson. I find that this document is protected from disclosure by the attorney-client privilege. Both NICS and Mrs. Johnson were clients of Osborn. Neither the agreement itself nor the record indicates that the document was ever disclosed to anyone other than NICS and Mrs. Johnson. Under these circumstances, the attorney-client privilege is applicable:

> "There may be a relative, not an absolute, confidence.
>
> "The chief instance occurs when the *same attorney acts for two parties* having a common interest, and each party communicates with him. Here

---

**2.** The original and copies are counted as a single document.

the communications are clearly privileged from disclosure at the instance of a third person." 8 Wigmore, Evidence § 2312 (McNaughton rev. 1961)

■ The second, third, and fourth documents included in Exhibit A are information copies of letters from an accounting firm to the State Department of Revenue regarding gift and estate taxes for Mrs. Johnson. These documents obviously are not protected by the attorney-client privilege as defined above.

The only document contained in Exhibit B is a letter from Osborn to Johnson. This document clearly falls within the privilege.

*Item 4: Two Wills*

As noted above, Osborn possesses no documents pertaining to item 4. The question remains, however, whether he may be required to answer the questions which were posed to him regarding preparation of wills for Johnson and his wife (Q–84, 525–542). Mrs. Johnson is now dead.

■ Wigmore adopts the following rules for application of the attorney-client privilege to the execution and contents of a will:

"[I]t can hardly be doubted that the execution and especially the contents are impliedly desired by the client to be kept secret during his lifetime, and are accordingly a part of his confidential communication. It must be assumed that during that period the attorney ought not to be called upon to disclose even the fact of a will's execution, much less its tenor. But, on the other hand, this confidence is intended to be temporary only. That there may be such a qualification to the privilege is plain. That it appropriately explains the client's relation with an attorney drafting a will seems almost equally clear.

"It follows, therefore, that after the *testator's death* the attorney is at liberty to disclose all that affects the execution and tenor of the will." 8 Wigmore, Evidence § 2314 (McNaughton rev. 1961)

I find that Osborn is required to answer questions regarding preparation of a will for Mrs. Johnson. The attorney-client privilege protects against disclosure of information about any will which might have been prepared for Mr. Johnson.

*Item 5: Property Transaction*

■ The two files submitted by Osborn for *in camera* inspection are designated Exhibits C and C–1. All the documents relate to real estate transactions. These documents are not protected by the attorney-client privilege. The privilege applies only to information which constitutes a confidential communication between attorney and client. It is not applicable when the client necessarily contemplated divulging information to a third party. *United States v. McDonald,* 313 F.2d 832, 835 (2d Cir. 1963). The documents contained in Exhibits C and C–1 must be produced for inspection by petitioners unless they are protected by the privilege against self-incrimination discussed below.

*Item 6: Ben Johnson Insurance Co.*

Osborn submitted four files for *in camera* inspection, designated Exhibits D, D–1, D–2, and D–3.

Exhibit D contains documents regarding the possible purchase of an insurance company. With one exception, these documents are not attorney-client communications and are not protected by the privilege. The exception is a memo from Osborn to Johnson dated June 16, 1971. This document is privileged.

■ Exhibit D–1 contains three pages of handwritten notes of a third party furnished to Osborn by Johnson regarding the possible purchase or formation of an insurance company. These notes constitute a communication between a third party and the client, Johnson, rather than an attorney-client communication. They are not within the protection of the attorney-client privilege.

■■ Exhibit D–2 contains only two documents. The first is a copy of the same memo found in Exhibit D and, accordingly, is privileged. The second is a

letter from a third party to Osborn regarding an offer to purchase an insurance company. This document contains Osborn's handwritten notes on the reverse side. Absent any showing that these notes reflect a communication between attorney and client, I find that the information in this document is not privileged.

Exhibit D–3 contains only Osborn's handwritten notes. These notes reflect information which Osborn could have obtained only from his clients and are, therefore, protected by the attorney-client privilege.

*Item 7: World Computer Corporation*

 The eight files containing documents pertaining to item 7 have been designated Exhibits E, E–1, E–2, E–3, E–4, E–5, E–6, and E–7. Each file contains numerous documents, most of which are communications between a client and a third party or between unidentified parties. The burden of establishing the attorney-client privilege rests on the claimant of the privilege. *United States v. Gurtner,* 474 F.2d 297, 298 (9th Cir. 1973). I find that this burden has not been met as to most of the documents pertaining to item 7, including the communications between Osborn and Mr. Jolley of World Computer Corporation. As to the latter documents, intervenors have not established any relationship to World Computer Corporation entitling them to raise any attorney-client privilege.

 I do find, however, that the protection of the attorney-client privilege extends to certain of the documents contained in Exhibits E–2 and E–3. These documents consist of communications between Osborn and associate counsel regarding trademark searches conducted for NICS. The only privileged document in Exhibit E–2 is a copy of a letter from associate counsel to Osborn dated September 12, 1969. All documents in Exhibit E–3 are privileged, with the exception of two letters from Jolley to Osborn dated April 6, 1972, and August 21, 1972.

*Item 10: NICS Ledger Sheets*

 Osborn furnished petitioners with copies of all ledger sheets pertaining to NICS. These copies showed dates and fees for services performed by Osborn, but the "Items" column, specifically describing the services, was blocked out. After *in camera* inspection, I find that this information is protected from disclosure by the attorney-client privilege.

It is true that fees paid for legal work and the general nature of legal work performed do not constitute a "confidential communication" and are, therefore, outside the privilege. *United States v. Hodgson,* 492 F.2d 1175, 1177 (10th Cir. 1974); *Colton v. United States,* 306 F.2d 633, 636 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). But descriptions of services performed by an attorney necessarily intrude upon the area of confidential communication when they become more specific than the general responses, such as "litigation", "drafting of documents", or "tax advice", required in *Colton.* The court in that case noted "that some restriction may be necessary to protect the privilege and that none of the possible responses called for by [the question] as now limited would reveal anything which could be regarded as a communication within the meaning of the privilege doctrine." 306 F.2d at 638. I find that restriction is appropriate in this case to protect the privilege.

### PRIVILEGE AGAINST SELF-INCRIMINATION

The question of whether a client can assert his fifth amendment privilege against self-incrimination to prevent disclosure of documents in his attorney's possession is a difficult one. The circuits which have confronted the question are in disagreement, and the Supreme Court has only recently granted certiorari in two cases reaching contrary conclusions. *United States v. Fisher,* 500 F.2d 683 (3d Cir. 1974), cert. granted, 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975); *United States v. Kasmir,* 499 F.2d 444 (5th Cir.

1974), cert. granted, 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975). In the absence of direction from the Supreme Court, however, I must decide this question in light of the other cases which have considered it.

Initially, I must determine the impact of the one Supreme Court case, *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), which bears directly upon my decision. In that case, the Court held that the taxpayer could not invoke her fifth amendment privilege against self-incrimination to prevent the production of her business and tax records in the possession of her accountant. Some of the Court's language is broad in its sweep:

> "It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: 'A party is privileged from producing the evidence but not from its production.' The Constitution explicitly prohibits compelling an accused to bear witness 'against himself': it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege . . . ." 409 U.S. at 328, 93 S.Ct. at 616, 34 L.Ed.2d at 554 (citations omitted).

The Court emphasized that possession, not ownership, marks the bounds of the privilege:

> "[P]ossession bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment. To tie the privilege against self-incrimination to a concept of ownership would be to draw a meaningless line." 409 U.S. at 331, 93 S.Ct. at 617, 34 L.Ed.2d at 555.

*Couch* does not stand for the proposition that a taxpayer can never assert his fifth amendment privilege as to documents not in his actual possession. The Court refused to adopt a per se rule or to conjecture about situations not before it. 409 U.S. at 336 n. 20, 93 S.Ct. at 619, 34 L.Ed.2d at 558. The opinion recognizes that constructive possession may suffice under some circumstances. 409 U.S. at 333, 93 S.Ct. at 618, 34 L.Ed.2d at 556. Moreover, while *Couch* holds that the nature of the accountant-client relationship does not give rise to an expectation of protected privacy or confidentiality, the Court acknowledges that such an expectation may be important in determining the scope of the privilege. 409 U.S. at 335–336, 93 S.Ct. at 557, 558, 34 L.Ed.2d at 619–620. Justice Brennan, dissenting, assumes without discussion that this expectation protects documents in the hands of an attorney: "A transfer to a lawyer is protected, not simply because there is a recognized attorney-client privilege, but also because the ordinary expectation is that the lawyer will not further publicize what he has been given." 409 U.S. at 350, 93 S.Ct. at 627, 34 L.Ed.2d 566. (Brennan, J., dissenting).

Before *Couch* was decided, the lower federal courts were in disagreement over whether the client's privilege against self-incrimination could prevent production of documents held by his attorney. See the authorities cited in *United States v. Schmidt,* 360 F.Supp. 339, 345 nn. 11 and 13 (M.D.Pa.1973). *Couch* has not served to resolve these differences. Cases since *Couch* finding that the client's privilege may prevent production include *United States v. Kasmir,* 499 F.2d 444 (5th Cir. 1974), cert. granted, 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975); *United States v. De Castro,* 75–2 U.S.T.C. ¶ 9535 (C.D.Cal. Feb. 26, 1975); *United States v. Riland,* 364 F.Supp. 120 (S.D.N.Y.1973); and *United States v. Cutter,* 374 F.Supp. 1065 (W.D.N.C.1974). Cases finding that the client's privilege did not prevent production include *United States v. Fisher,* 500 F.2d 683 (3d Cir. 1974), cert. granted, 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975); and *United States v. White,* 477 F.2d 757, aff'd en banc, 487 F.2d 1335 (5th Cir. 1973), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). As already noted, the Supreme Court has granted certiorari in two of these cases.

On balance, I find the cases upholding the privilege more persuasive. The rationale advanced by the court in *United States v. Judson,* 322 F.2d 460 (9th Cir. 1963), is particularly convincing:

"Clearly, if the taxpayer in this case . . . had been subpoenaed and directed to produce the documents in question, he could have properly refused. The government concedes this. But instead of closeting himself with his myriad tax data drawn up around him, the taxpayer retained counsel. Quite predictably, in the course of the ensuing attorney-client relationship the pertinent records were turned over to the attorney. The government would have us hold that the taxpayer walked into his attorney's office unquestionably shielded with the Amendment's protection, and walked out with something less." 322 F.2d at 466.

"The government states that the evil which the Fifth Amendment sought to prevent is not present when the prosecution seeks evidence of A's guilt from B. But this argument ignores the realities of the relationship existing where B is A's attorney. An attorney is his client's advocate. His function is to raise all the just and meritorious defenses his client has. No other 'third party,' nor 'agent,' nor 'representative' stands in such a unique relationship between the accused and the judicial process as does his attorney." 322 F.2d at 467.

This rationale can be rephrased in the language of *Couch,* as the Fifth Circuit has done:

"When the taxpayer subsequently transferred his records to his attorney pursuant to the attorney-cleint [sic] relationship, in our judgment he retained that legitimiate [sic] expectation of privacy or private enclave with respect to the records. . . . [We] reject the idea that a taxpayer's right to be free from self-incrimination can be *decreased* or defeated by the taxpayer's

transfer of records to his attorney pursuant to the attorney-client relationship." *United States v. Kasmir,* 499 F.2d at 452.

■ I hold that the individual intervenors' privilege against self-incrimination protects them from the compelled production of their records in Osborn's possession.[3] It is true that these records were turned over to Osborn for his use in the course of rendering routine legal advice while many cases upholding the privilege have involved records delivered to an attorney for his use in imminent litigation. I do not find this distinction significant enough to vitiate the privilege.

I do not hold, however, that every document contained in Osborn's files falls within the fifth amendment privilege, regardless of its nature. To so hold would extend virtual immunity to every client file maintained in an attorney's office. *Couch* and the rationale set forth above require that the privilege be limited to those documents which were in the client's possession but which he has delivered to the attorney for his use in performing legal services. The documents which fall within this category and which are, therefore, protected from disclosure by intervenors' privilege against self-incrimination are listed below.

*Item 1: Estate Planning*

No document is within the privilege.

*Item 2: Ben Johnson Trust*

No document is within the privilege.

*Item 3: Stock Redemption Agreement*

No document is within the privilege.

*Item 5: Property Transaction*

In Exhibit C, the privilege extends to two documents, a letter to Mr. Johnson from a third party dated May 1, 1971, and the attached thirteen-page Agreement of Sale executed by the vendor

---

**3.** The privilege cannot, of course, be invoked as to any of the records of the corporate intervenor, NICS, which may be in Osborn's possession. *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911).

only. In Exhibit C–1, the privilege extends to the Supplemental Escrow Instructions of September 19, 1972, and the attached Report of Personal Representative of Decedent.

### Item 6: Ben Johnson Insurance Co.

Exhibit D contains several documents which were furnished to Osborn by Johnson and which I find to be privileged. Those documents are six separate financial statements for insurance companies, a brochure for a consulting actuarial firm, seven letters between Johnson or Linder and a third party or between two third parties written in May, 1971, two pages of telephone billings, and two pages reflecting checks issued in June and July, 1971. All other documents in Exhibit D fall outside the scope of the privilege against self-incrimination.

The handwritten notes in Exhibit D–1 were furnished to Osborn by Johnson and are within the privilege.

No document in Exhibits D–2 or D–3 is within the privilege.

### Item 7: World Computer Corporation

The documents contained in Exhibit E are copies of correspondence between NICS and another company regarding payment for audiovisual materials prepared by the latter for NICS. These documents were turned over to Osborn for his review when a lawsuit was threatened. NICS cannot assert any privilege against self-incrimination, and I find no indication that the individual intervenors are entitled to assert such a privilege on their own behalf. These documents must be disclosed for that reason.

None of the documents in Exhibits E–1 through E–7 are within the privilege. Although some of these documents were apparently turned over to Osborn by representatives of World Computer Corporation, the individual intervenors have not established any relationship to that company which entitles them to assert their personal privilege.

### Item 10; NICS Ledger Sheets

No document is within the privilege.

In summary, Mr. Osborn is required to testify regarding any will prepared for Mrs. Johnson (Item 4) and to produce the following documents:

Item 3: three information copies of letters to the State Department of Revenue (Exhibit A).

Item 5: original and copies of pages 1 through 3 of an Agreement of Sale (Exhibit C); letter of May 25, 1971, from Osborn to Johnson (Exhibit C–1); data card with handwritten notations (Exhibit C–1).

Item 6: State of Oregon Form 814–3323, Application for Permit to Organize Stock Insurance Corporation (Exhibit D); five-page Agreement between Ben Johnson and George Casey (Exhibit D); documents pertaining to a questionnaire to be distributed to automobile dealers (Exhibit D); five typed pages and two handwritten pages of notes regarding organization or acquisition of an insurance company (Exhibit D); letter to Osborn dated August 12, 1971 (Exhibit D-2).

Item 7: all documents in Exhibits E and E–1 through E–7, except the correspondence between Osborn and associate counsel in Exhibits E–2 and E–3.

All other documents submitted for *in camera* inspection fall within either the attorney-client privilege or the privilege against self-incrimination. The petition to enforce the Internal Revenue Service summons is denied as to those documents.

Mr. Osborn has impressed this court with his sincere desire to cooperate with the Internal Revenue Service while at the same time fulfilling his ethical obligations to his former clients. His situation is not an enviable one, and he is to be commended for his efforts.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).