(No. 43277.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* EDWARD DORR, Appellant.

*Opinion filed Nov. 18, 1970.—Rehearing denied Jan. 27, 1971.*

BELLOWS, BELLOWS & MAGIDSON, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, (ROBERT S. ATKINS and ROBERT F. COLEMAN, Assistant Attorneys General, of counsel,) for appellee.

Mr. JUSTICE CULBERTSON delivered the opinion of the court:

. This is an appeal from an order of the circuit court of Cook County adjudging Edward Dorr (herein referred to as respondent) in contempt of court for wilfully failing to comply with a court order requiring the production of certain documents theretofore requested from him under a *subpoena duces tecum.* The presence of constitutional questions brings the cause directly to this court. (See our Rule 603.) 43 Ill.2d R. 603.

The record before us discloses that a special February, 1970, Cook County grand jury, impaneled for the purpose of investigating possible violations of the Illinois Antitrust Act (Ill. Rev. Stat. 1969, ch. 38, par. 60—1 *et seq.*) within the coal industry in this State, caused the issuance and service upon respondent of a *subpoena duces tecum* calling for the production of documents, books, and records, of the Roth-Adam Fuel Company, of which respondent is president.

In response to the subpoena, the salient points of which appear as an appendix hereto, respondent delivered to the grand jury the following documents relating to Roth-Adam: Copies of the certificate of incorporation, by-laws, and corporate minutes commencing with the minutes of the annual meeting of stockholders on June 30, 1965, as part of the "Corporate Records"; the 1969 annual statement, containing the names and addresses of the officers and board of directors; W-4 forms, which contain the names, addresses, and positions of employees; the "Check and Voucher Register", reflecting all disbursements made by Roth-Adam, except for payroll, but including payment of commissions; the "Profit and Loss" statements and "Balance Sheets" for

the fiscal years ending June 30, 1965, 1966, 1967, 1968, 1969; copies of price lists commencing with that of December 1, 1966; a file containing all documents relating to bids submitted by Roth-Adam; a file containing all documents relating to conventions, meetings, *etc.*; two files containing all correspondence between Roth and the Chicago Coal Merchants Association, its members and associate members, *etc.;* two files containing all correspondence between Roth-Adam and any Federal, State, local, or other public bodies and regulatory agencies; a file containing all documents relating to complaints received by Roth-Adam; a "Blue Book of Telephone Numbers"; and a file containing copies of work sheets showing salesmen's expenses for the fiscal years ending June 30, 1965, 1966, 1967, 1968, and 1969.

Some time later the Attorney General, on behalf of the special grand jury, communicated a further demand to respondent through his counsel, specifically designating by category the types of documents further desired. In this regard, respondent raises no contention that this later demand requested materials not originally called for in the subpoena. After conferences between representatives of the Attorney General and counsel for respondent, the latter agreed to produce all "back-up" documents relating to salesmen's expenses; miscellaneous selling expenses, and miscellaneous, general and administrative expenses, notes receivable, and miscellaneous investments. Respondent, however, refused to produce the following materials: All payroll checks issued during the period covered by the subpoena; copies of the quarterly employer tax returns of Roth-Adam, commonly referred to as IRS forms 941; and all documents related to the following bookkeeping accounts: salesmen's salaries, advertising, miscellaneous commissions, office salaries, officers' salaries, legal, auditing, and collection fees, contributions, loans receivable, sundry receivables, investment of seasonable funds, prepaid salaries and wages, and accrued salaries and wages. There is, again, no question

raised that the foregoing documents and records were not covered by the terms of the subpoena itself.

On the ground that the demand for the documents and records which respondent has refused to produce was invalid as a "constructive" unreasonable search and seizure (see *People* v. *Lurie,* 39 Ill.2d 331; *People* v. *Allen,* 410 Ill. 408, 513), respondent petitioned the circuit court for an order quashing the subpoena. The Attorney General filed an answer to the petition, and after a hearing, the petition was denied and respondent was ordered to produce the documents in question.

Thereafter, the Attorney General filed a motion for a ruling directing respondent to show cause why he should not be held in contempt of court for refusing to produce the requested materials. The ruling issued, and respondent, in answer thereto, raised the same constitutional objections theretofore set forth in his petition seeking to quash the subpoena. At the hearing on the rule to show cause, respondent admitted his refusal to produce the documents in question and was thereupon adjudged in contempt of court and committed to the county jail. Bail was set at $5000, and the requisite $500 cash deposit was made.

It is argued by respondent that insofar as the subpoena called for the materials which he refused to produce, it constitutes an attempted unreasonable search and seizure prohibited by the fourth and fourteenth amendments to the Federal constitution and section 6 of article II of the Illinois constitution. Specifically, respondent contends that there was no showing that the documents and records sought are material or relevant to the grand jury's investigation. In that regard, the Illinois Antitrust Act makes it illegal for any person or corporation to:

> "(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto * * *;

b. fixing, controlling, maintaining, limiting, or discontinuing the * * * mining, sale or supply of any commodity * * * for the purpose or with the effect stated in paragraph a. * * *;

c. allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for any commodity or service; * * *." Ill. Rev. Stat. 1969, ch. 38, par. 60—3.

Because of the numerous and varied activities which may constitute substantive violations of the quoted portions of the Act, grand jury investigations seeking to ascertain the probable existence of such violations must be given the broadest scope possible, consistent, of course, with constitutional limitations. Thus in the circumstances here present, what we observed in *People* v. *Allen,* 410 Ill. 508, 517, is particularly pertinent: "In litigated cases, materiality can be fixed with a relatively high degree of precision by reference to the issues formulated in the pleadings. No standard of comparable certainty exists with respect to an inquiry by a grand jury. The very purpose of such an inquiry is to uncover matters previously unknown to the investigating agency. It is not necessary that a 'cause' or 'specific charge' be pending before the grand jury as a condition to its right to command the production of documents. (*Hale* v. *Henkel,* 201 U.S. 43; *Wilson* v. *United States,* 221 U.S. 361.) Such a requirement, as pointed out in *Hale* v. *Henkel,* would sharply curtail the historic function of the grand jury. '[R]elevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry.' *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186.

"Unless the effectiveness of the grand jury in the ad-

ministration of criminal law is to be drastically impaired, the most that can be required as a standard of materiality is as precise a statement of the subject under investigation as the circumstances permit."

In the present case, we believe that the documents which respondent refused to produce are patently relevant to an antitrust investigation, and it was accordingly unnecessary for the Attorney General to introduce evidence satisfying that criterion. Thus, a review of the payroll checks may uncover payments made not to *bona fide* employees of Roth-Adam but to competitors, either directly or through strawmen, as a part of a price-fixing or market allocation scheme. (That respondent willingly produced the W-4 forms it held in connection with its acknowledged employees clearly cannot preclude the grand jury from obtaining payroll checks, as it is difficult to imagine that the company would have a competitor or strawman fill out a W-4 form prior to the receipt of an illegal payment under the guise of a payroll expenditure.) The quarterly employer tax returns are equally material and relevant to the investigation of possible antitrust violations, as are the records pertaining to the various accounts payable and receivable. Under these circumstances, we cannot perceive that the grand jury's demand for production of the materials respondent refused to produce in any way transcended the legitimate purpose of the investigation.

It should be noted that respondent makes no claim that he is unable to ascertain exactly what documents have been demanded, and there is thus no question posed concerning the specificity of the demand (see *e.g., People ex rel. Legislative Commission* v. *Keefe,* 36 Ill.2d 460). The argument set forth in respondent's brief that subpoenas "must specify with reasonable particularity the subjects to which the desired writings relate" is in the context of this case merely an alternate manner of arguing that relevance of the materials sought must be established, and, as we have seen,

the records and documents sought here are patently material and relevant to an investigation into possible violations of the Antitrust Act.

The judgment of the circuit court of Cook County finding respondent in contempt of court for wilfully refusing to obey the order to produce the documents in question is affirmed.

*Judgment affirmed.*

---

## APPENDIX
### *(Subpoena Duces Tecum)*

#### I. DEFINITIONS

1. The term "coal" as used in this subpoena shall mean and include any or all types, classes and kinds of coal such as anthracitic, bituminous, subbituminous, and lignitic of any and all sizes and characteristics, whether or not said coal has gone through preparations or treatments.

2. The term "low sulfur coal" as used in this subpoena shall mean and include any or all types, classes, or kinds of coal with a total sulfur content of 2.5% or less.

3. The term "association" as used in this subpoena shall include the Chicago Coal Merchants Association, predecessor and successor associations, any or all divisions, subdivisions, sections or subsections thereof, and any or all persons acting for or on behalf of the association, its predecessors or successors, and its divisions, subdivisions, sections or subsections.

4. The term "member" or "associate member" as used in this subpoena shall mean persons belonging to, paying dues to, or in any way affiliated with the association.

5. The term "coal dealer" as used in this subpoena shall mean any person or company, including affiliates or subsidiaries engaged in the purchase, sale, storage, delivery and trimming of coal, and shall include any and all persons acting for or on behalf of such person or company.

6. The term "coal operator" or "coal mine operator" as used in this subpoena shall mean any person or company, including affiliates or subsidiaries engaged in the mining, sizing, washing and/or other preparation, and delivery of coal; and shall include any and all persons acting for or on behalf of such person or company.

7. Wherever the word "person" or "persons", or "company" or "companies" is used herein, it includes (unless otherwise specified) but is not limited to individuals, individual proprietorships, trusteeships, partnerships, companies, and corporations, including (except with respect to individuals) their predecessors or successors, affiliates and controlled subsidiaries, and wholly-owned subsidiaries.

8. The term "document" or "documents" as used in this subpoena includes (unless otherwise specified), but is not limited to originals, where available, and otherwise, a carbon or other copy of each item of correspondence, graphs, charts, tables, minutes, minute books, papers, letters, memoranda, and written communications of any kind, notes, and records of any communications, instructions, reports, cables, telegrams, radiograms, and other messages in the possession or control of the

ROTH ADAMS FUEL COMPANY, (hereinafter referred to as ROTH), or in the possession or control of any officer, director, agent, employee or representative of ROTH, acting in his capacity as such officer, director, agent, employee or representative, including documents which were prepared by an officer, director, agent, employee, or representative of ROTH, which did not leave custody of the person preparing the same.

9. The term "awarding authority" or "awarding authorities" as used in this subpoena shall mean all persons, including, but not limited to building managers; engineers, purchasing agents; Federal, State, municipal and local governing or administrative bodies; committees; school board; and other organizations or persons repsenting either private, public, or charitable bodies or institutions vested with the responsibility of designating and selecting coal dealers, among others to perform supply contracts, including contracts for the sale, storing, delivery, and trimming of coal.

10. The term "complementary bid" or "complementary bids" as used in this subpoena shall mean any bid or quotation submitted by a coal dealer to an awarding authority in connection with the sale, storage, delivery or trimming of coal at the request of, pursuant to an agreement or understanding, express or implied, with another coal dealer or operator, group or association of coal dealers, or operators or other person or persons, which bid or quotation is contrived in excess of another bid or bids, submitted or to be submitted, for the identical sale.

## II. Scope

11. Each paragraph in the subpoena covers the period, unless otherwise specified, from January 1, 1965 up to and including the date of service of this subpoena.

### III. Documents to be Produced

12. A copy of the charter, articles of incorporation, by-laws and rules and operating procedure of ROTH, including all amendments thereto, from the date of formation of the company to the date of service of this subpoena.

13. All minutes (including rough drafts, handwritten notes of minutes, minute books, stenographic transcriptions, tape records, and notes of records later reduced to minutes) of all Board of Directors' meetings, officers' meetings, and all other meetings.

14. All books, records, and documents which show, relate or refer to, in whole or in part:

  (a) The names and addresses of all members of the Board of Directors, officers, management officials and employees of ROTH, including the office or position of each such person;

  (b) All disbursements, in cash or otherwise, including but not limited to cancelled checks and check stubs, made by ROTH, and all documents, including books of accounts, reflecting same;

  (c) The source, date, nature and amount of each item of income, money or property received by ROTH, including but not limited to gross sales, and all documents, including books of accounts, reflecting same;

  (d) The financial condition of ROTH, including but not limited to financial statements and audit reports, profit and loss statements, and balance sheets.

15. All books records and documents which show, relate or refer to, in whole or in part, to actual, proposed, suggested or contemplated prices and price changes in coal.

16. All documents containing annual reports, statistical reports, and any other reports which have to do with, refer or relate to, or concern the annual volume of business in the purchase, sale, delivery or trimming of coal in the Illinois area.

17. All documents containing annual reports, statistical reports and any other reports which have to do with, refer or relate to, or concern the supply of coal available for retail sales in the Illinois and/or Chicago area.

18. All documents containing annual reports, statistical reports and any other reports which have to do with, refer or relate to, or concern the supply of low sulfur coal available in the Illinois and/or Chicago area.

19. All documents which embody, report on, relate or refer to, or concern any written or oral exchange of information as to contracts or proposed contracts, bids or proposed bids for the sale

or submission or nonsubmission of prices, bids, or quotations for the sale of coal between ROTH and any coal dealer or operator or group or groups of coal dealers and/or operators, or between ROTH and the association.

20. All documents which embody, report on, relate or refer to, or concern bids and computation of bids submitted by ROTH for the sale, storage, delivery or trimming of coal including, but not limited to, such documents as show the dates of submission of each bid and the amount or amounts thereof, the names, addresses and position of the person or persons preparing the bid or bids.

21. All documents relating or referring to, concerning, or showing agreements between ROTH and any trade union or local subdivision thereof, its officers, business agents, representatives or employees.

22. All documents which relate or refer to the actual, contemplated or proposed classification of any or all coal dealers by size, sales, purchases, number of employees, financial responsibility, or by any other criteria.

23. All documents which report on, relate or refer to, or concern the actual, contemplated or proposed allocation or division of marketing territories for the sale, storage, delivery or trimming of coal by or among ROTH and any coal dealer or operator, group or groups of coal dealers or operators.

24. All documents which relate or refer to, or concern any convention, meeting, function, trips, gatherings and/or outings, either formal or informal, sponsored, arranged or initiated in whole or in part by the association, its members or associate members, or any of them including but not limited to, announcements of such conventions, meetings, functions, trips, gatherings and/or outings, reservations covering accommodations for meetings and lodging; travel arrangements, list of names and addresses of those registered and/or in attendance at the convention, meeting, function, trips, gatherings and/or outings; together with the name, address and location of the hotels, motels or other establishment where each of those in attendance stayed.

25. All documents which relate or refer to, concern or show:

(a) The allocation of a contract or contracts for the sale, storage, delivery, or trimming of coal to a coal dealer or coal dealers, or the designation or selection of a coal dealer or coal dealers as low bidder or bidders on a contract for the sale, storage, delivery or trimming of coal by ROTH, or by a coal dealer or coal operator, group or association of coal dealers or operators, or by any person or persons other than an awarding authority;

(b) The submission or nonsubmission, or the proposed, sug-

468

gested or contemplated submission or nonsubmission of complementary bids or quotations for the sale, storage, delivery or trimming of coal, by a coal dealer or group or groups of coal dealers, or the withdrawal or alteration, or the proposed, suggested, or contemplated withdrawal or alteration of a bid or quotation for the sale, storage, delivery or trimming of coal;

(c) Requests, suggestions or proposals made by any person, including, but not limited to ROTH, the association, its members and associate members, any coal dealer or operator or group or groups of coal dealers or operators, to a coal dealer to refrain from submitting a bid or quotation for the sale, storage, delivery, or trimming of coal; or to submit a suggestion or fixed quotation for the sale, storage, delivery or trimming of coal;

(d) The payment, offer, or contemplated or suggested offer of payment of any rebate, commission, kickback, or other inducement to a coal dealer or operator by ROTH, or by the association or by any member or members or associate member or members of the association, or by a coal dealer or operator, group or groups of coal dealers or operators;

(e) Any rebate, commission in the form of a sum of money or article of value, or any other consideration (excluding taxes and license fees prescribed by Federal, State or municipal statutes, of ordinances, laws or regulations), paid, or proposed, suggested or contemplated to be paid by ROTH, the association or any member or members or associate member or members thereof, or by a coal dealer or operator or group or groups of coal dealers or operators, to an awarding authority, its agents, employees, representatives or officials or to anyone connected directly or indirectly with the sale, storage, delivery or trimming of coal;

(f) The refusal or abstention, or the suggested or proposed refusal or abstention of ROTH, or the association, or any or all of its members or associate members or of a coal dealer or group or groups of coal dealers to submit bids or quotations for the sale, storage, delivery, or trimming of coal for any reason whatsoever.

26. All documents, including books and records, relating to any person or organization hired or otherwise retained by ROTH, to make notes or make a stenographic record of any meetings held by

27. All correspondence, letters, memoranda, post cards and brochures, and written communication from ROTH to the associa-

tion, its members and associate members, coal dealers or operators, or group of coal dealers or operators.

28. All correspondence, letters, memoranda, post cards and brochures, and written communication from the association, its members and associate members, coal dealers or operators, or group of coal dealers or operators to ROTH.

29. All correspondence, letters, memoranda, post cards and brochures, and written communication from ROTH to Federal, State, local or other public bodies and regulatory agencies.

30. All correspondence, letters, memoranda, post cards and brochures, and written communication from Federal, State, local, or other public bodies and/or regulatory agencies to ROTH.

31. All documents which report on, relate or refer to, or concern complaints, either directly or indirectly, received by ROTH, and all reports or records reflecting any investigation, and/or disposition made of said complaint by the company.

32. All appointment books, telephone records and office diaries for the officers, directors, employees and agents of ROTH.

33. All monthly expense reports, accounts, or similar documents for each of the officers, directors, employees, and agents of ROTH.

34. All books, records and documents which show, relate or refer to, in whole or in part, to the gross margin per ton of coal sold during the period covered by this subpoena to any awarding authority.