**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 10 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FEDERAL TRADE COMMISSION,

Plaintiff - Appellee,

v.

H. G. KUYKENDALL, SR., individually
and as an officer of National Marketing
Service, Inc., NPC Corporation of the
Midwest, Inc. and Magazine Club Billing
Service, Inc.; C. H. KUYKENDALL;
DIVERSIFIED MARKETING SERVICE
CORP., an Oklahoma corporation;
NATIONAL MARKETING SERVICE,
INC., an Oklahoma corporation; NPC
CORPORATION OF THE MIDWEST,
INC., an Oklahoma corporation; H. G.
KUYKENDALL, JR.; MAGAZINE
CLUB BILLING SERVICE, INC., an
Oklahoma corporation,

Defendants - Appellants.

Nos. 02-6101 and 02-6102

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-96-388-M)**

---

Gregory J. Kerwin, Gibson, Dunn & Crutcher, LLP (Taggart Hansen and Michael L.
Denger, Gibson, Dunn & Crutcher, LLP, Washington, D.C.; Andrew W. Lester and Susan
B. Loving, Lester, Loving & Davies, P.C., with him on the briefs), Denver, Colorado for
Defendants - Appellants H.G. Kuykendall, Sr. and C.H. Kuykendall.

Walter H. Sargent, Walter H. Sargent, a professional corporation (Stephen G. Solomon and George W. Velotta II, Derryberry, Quigley, Solomon & Naifeh, Oklahoma City, Oklahoma, with him on the briefs), Colorado Springs, Colorado, for Defendants - Appellants H.G. Kuykendall, Jr., Diversified Marketing Services Corp., National Marketing Service, Inc., NPC Corporation of the Midwest, Inc., and Magazine Club Billing Service, Inc.

John F. Daly, Deputy General Counsel for Litigation, Federal Trade Commission (William E. Kovacic, General Counsel, Michele Arington, Attorney, Gary L. Ivens and S. Brian Huseman, Of Counsel, with him on the briefs), Washington, D.C., for Plaintiff-Appellee.

---

Before **TACHA**, Chief Judge, **SEYMOUR**, **EBEL**, **KELLY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

On January 28, 2002, the Federal Trade Commission ("FTC" or "Commission") sought $51 million in sanctions and a contempt order against the defendant telemarketers, permanently banning them from the magazine sales business. The district court held an evidentiary hearing twenty-eight days later. After the hearing, the court found the defendants in contempt of a prior injunctive order and imposed $39 million in monetary sanctions against them jointly and severally.

On appeal, a panel of this court affirmed the district court's judgment except for its determination of the amount of monetary sanctions and remanded the case to the district court for a jury trial to determine the appropriate measure of sanctions. *See Federal*

*Trade Commission v. Kuykendall*, 312 F.3d 1329 (10th Cir. 2002) ("Panel Opinion"). We granted rehearing to consider whether the panel correctly interpreted Supreme Court and Tenth Circuit precedent in ordering a limited jury trial on remand, as well as to examine several corollary issues related to individual liability and the procedures required in contempt actions.[1]

On rehearing, we agree with the panel and the district court that the underlying proceedings were correctly classified as civil contempt proceedings, but we hold that the panel erred in requiring that damages be proven on remand by clear and convincing evidence before a jury. We also conclude that the district court erred in finding certain

---

[1] On rehearing en banc we asked the parties to brief the following:

  1)    May a person be effectively prohibited by the court from resigning his position as an officer or director because he was a signatory to an original consent decree?
  2)    If a limited remand is ordered in this civil contempt case to determine only the amount of consumer injury caused by Appellant's contumacious conduct (damages), (a) must that issue be tried to a jury? and (b) was a jury timely and properly demanded?
  3)    If a jury trial is required in this civil contempt case can its consideration be limited to damages or must it be permitted to consider all issues?
  4)    Must damages be proved by clear and convincing evidence or merely by a greater weight of the evidence?

Order, April 8, 2003.

As the remainder of this opinion will make clear, our disposition of some of the threshold issues involved makes it unnecessary to address each of these questions.

-3-

individual defendants liable and in failing to adequately explain its determination of damages. We therefore vacate the Panel Opinion, reverse the judgment of the district court in part, and remand the case to the district court for additional proceedings in accord with this opinion.

## I.

## BACKGROUND

This case arises out of a complaint the FTC filed in 1996. The complaint alleged that the defendants' telemarketing of magazine subscriptions involved persistent deceptive and misleading practices in violation of § 5 of the Federal Trade Commission Act ("FTC Act"). *See* 15 U.S.C. § 45 (2000). The FTC sued the owners of the business, H.G. Kuykendall, Sr. and C.H. Kuykendall (together, the "Senior Kuykendalls" or "Seniors") and H.G. Kuykendall, Jr., both as individuals and as officers of the corporate defendants—Diversified Marketing Service Corp. ("DMS"); National Marketing Service, Inc.; NPC Corporation of the Midwest, Inc.; and Magazine Club Billing Service, Inc.

In March 1996, the FTC moved for a temporary restraining order, which the district court granted. After an evidentiary hearing, the court also granted the FTC's request for a preliminary injunction enjoining the defendants from certain specified practices and freezing the assets of the corporate defendants. The defendants appealed the injunction, but before that appeal was heard the parties entered into a settlement that was eventually incorporated into a "Stipulated Final Judgment and Order for Permanent

Injunction," filed October 18, 1996 ("Permanent Injunction"). The Permanent Injunction included twenty-four paragraphs limiting the defendants' future business conduct. The defendants also paid the FTC $1.5 million for consumer redress.

The Senior Kuykendalls and H.G. Kuykendall, Jr., executed the Permanent Injunction both as individuals and as officers of the corporate defendants[2] and signed separate acknowledgments stating that they had read and understood the various provisions they were agreeing to follow, including the Telemarketing Sales Rule and the Permanent Injunction itself. App. at 1042–43, 1089–91. Among other things, the signatories to the Permanent Injunction agreed (1) to be enjoined from "misrepresenting, either orally or in writing, directly or by implication, any material fact"; (2) to ensure that any tape recorded conversations "reflect the entirety of the conversation" and include clear and understandable disclosures of all material terms of the order; and (3) to be enjoined from failing to cancel "all or any portion of" a subscription at the customer's request "where the defendants have reason to believe that any misrepresentation" had been made. App. at 1019–47. Each Kuykendall also agreed to notify the FTC in the event "of any change in his employment status within ten (10) days of such change." App. at 1038.

---

[2] Although they signed the stipulation as officers, apparently the Senior Kuykendalls had resigned their positions as corporate officials prior to the settlement and by that time were only shareholders in the corporations. *See* App. at 164, 166, 682–83, 690.

On January 14, 1997, as required by the Permanent Injunction, the defendants sent a compliance report to the FTC setting forth new drafts of subscription agreements and new policies that had been drafted to comply with the Permanent Injunction. *See* App. at 2045–2128. The FTC did not respond to the compliance report and until spring 2001 had no interaction with the defendants. In April 2001, responding to consumer complaints, the FTC sent defendants a letter expressing "concern[] that [the defendants] may be engaged in practices that violate the Permanent Injunction." App. at 1093–96. Later that month, FTC representatives conducted an on-site investigation of the defendants' activities and seized copies of corporate records and consumer complaints.

Approximately nine months later, on January 28, 2002, the FTC filed a motion to show cause why the defendants should not be found in contempt of the Permanent Injunction and requested that the district court award $51 million in contempt sanctions. All of the defendants moved to dismiss on due process grounds, and the Senior Kuykendalls additionally moved to dismiss, claiming a lack of personal liability. The district court denied these motions. The defendants also moved for additional time and discovery. The district court granted the defendants a short extension of time to file their briefs, but rejected the remainder of their motion, including their request to conduct further discovery.

Prior to trial, the parties exchanged evidence they intended to introduce at the hearing. The defendants deposed three employees of the FTC who had submitted

declarations in support of the motion to show cause. The defendants also had access to ten declarations filed by the FTC that the FTC claimed were representative of the types of telemarketing practices engaged in by the defendants.

The evidentiary hearing began twenty-eight days after the FTC filed its show cause motion. On February 25 and 26, 2002, the FTC and the defendants both introduced evidence and put on live witnesses. The FTC's evidence included the testimony of two customers, an investigator from the Oklahoma Attorney General's office, the individual defendants themselves, and selected employees of the defendants. The defendants called four witnesses, including H.G. Kuykendall, Jr., provided their customer service records, and had the opportunity to cross-examine the FTC's witnesses.

On March 4, 2002, the district court entered an Order for Contempt and Modifying the Permanent Injunction. App. at 556–60. The court found the defendants had engaged in "many instances" of conduct violating five specific paragraphs of the Permanent Injunction. It found the consumer injury caused by this conduct was "at least $39,000,000" and held each of the defendants jointly and severally liable for consumer redress in that amount. This appeal followed.

## II.

## CLASSIFICATION OF CONTEMPT PROCEEDINGS

## A.

The panel held in Part II of its opinion that this case is one of civil contempt under *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 (1994). We agree. However, while the panel correctly stated that "having decided that the contempt proceeding was civil in nature does not end our inquiry," *see Panel Opinion*, 312 F.3d at 1337, we do not agree with the panel's conclusions about *Bagwell* and its application to this case. In contrast to the panel's decision, we hold that in a contempt action for compensatory civil sanctions, a jury trial is not required and damages need only be proven by a preponderance of the evidence.

In its opinion, the panel held this case required a departure from the traditional dichotomy between civil contempts and criminal contempts: "With a nod to Gertrude Stein, there are civil contempts and there are civil contempts." *Id*. at 1338. This was based on the panel's conclusion that *Bagwell* teaches that certain "high-end" contempt actions require different procedures than those usually followed in civil contempt actions, namely, a jury as neutral factfinder and an enhanced burden of proof. *Id*. The panel went on to find that the complexity of the injunction and the remedy imposed on the defendants here made it such a high-end case. *Id*. at 1340–41. The panel then applied a sliding scale of procedural safeguards and found that while the district judge's finding of liability

could be affirmed completely, the question of "determining the amount of consumer injury" had to be answered by a jury utilizing a clear and convincing standard of proof. *Id*. at 1342.

This is where our analysis parts company from the Panel Opinion. We read *Bagwell* to leave in place just two traditional types of contempt: civil contempt and criminal contempt. The Supreme Court did not create the high-end exception with a sliding scale of procedural requirements that the panel invokes. *See* 312 F.3d at 1338–39, 1342. Indeed, *Bagwell* explicitly states that there are only "two forms of contempt" and their "procedural contours . . . are well established." 512 U.S. at 827.

The *Bagwell* Court, in dicta, did acknowledge the difficulties inherent in the use of contempt sanctions for "out-of-court disobedience to complex injunctions [which] often require elaborate and reliable factfinding" and, therefore, that "the considerations justifying expedited procedures do not pertain." *Id*. at 833–34; *see also id*. at 843 (Scalia, J., concurring) ("As the scope of injunctions has expanded, they have lost some of the distinctive features that made enforcement through civil process acceptable."). It may be that the Supreme Court will one day decide that some injunctions do not "sufficiently resemble their historical namesakes to warrant the same extraordinary means of enforcement." *Id*. at 844 (Scalia, J., concurring). But the Court has thus far declined to find that modern injunctions have reached this point. *See id*. The "Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the

prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Rather than revamping the longstanding criminal/civil distinction, the Court's holding in *Bagwell* was simply that in a case involving noncompensatory fines amounting to "serious criminal sanctions," courts must apply the rules of criminal contempt that afford alleged contemnors such protections as trial by jury. *See* 512 U.S. at 838–39. The Court emphasized that its holding did not impose additional burdens in cases involving compensatory, civil contempt remedies. *Id*. at 838 ("Our holding, however, leaves unaltered the longstanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings."). Therefore, the important question in this case, as in *Bagwell*, is whether the contempt of which the defendants were accused is criminal or civil in nature.

B.

The *Bagwell* Court observed that "the distinguishing characteristics of civil versus criminal contempts are somewhat less clear" than are the "procedural contours" of each type. 512 U.S. at 827. One distinguishing characteristic is, however, well established: "[A] contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant.'" *Id*. (quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441 (1911)). As the panel states, "Consumer redress is a classic remedial sanction." 312 F.3d

-10-

at 1337; *see also Law v. NCAA*, 134 F.3d 1438, 1443 (10th Cir. 1998) ("[A] critical feature of civil contempt is that the punishment is remedial.") (internal quotation omitted); *In re Maurice*, 73 F.3d 124, 127–28 (7th Cir. 1995) (holding that a contempt sanction "is civil in nature, if the payment is designed to compensate for harm done"). Therefore, where the sanctions sought in contempt proceedings are solely to be used to compensate injured consumers, the proceedings are civil in nature.[3]

The defendants here argue that the district court's assessment of sanctions against them does not qualify as compensatory because (1) the FTC may retain funds in excess of what it requires to redress consumer injury and (2), notwithstanding number (1), the remedy is not for the benefit of the FTC, but for third-party consumers. Although as we discuss further in Part V below, we reverse certain provisions of the district court's contempt order because they allow noncompensatory sanctions, the fact that the order included some noncompensatory relief is not determinative of whether the proceedings were civil or criminal. That decision must of course be made at the outset of the

---

[3] The *Bagwell* Court's extended analysis of the rationale and complexity of the injunction before it, and of the defendants' opportunities to purge the sanction, was necessary because that case involved fines that were not compensatory. *See* 512 U.S. at 834 ("[N]either party nor any court [below] has suggested that the challenged fines are compensatory. . . . The issue before us accordingly is limited to whether these fines, despite their noncompensatory character, are coercive civil or criminal sanctions."). *Bagwell* and subsequent cases have noted that the "dichotomy between coercive and punitive" sanctions can be analytically difficult. *Id*. at 829; *see also Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129–30 (2d Cir. 1998). But where, as here, the sanctions sought are not coercive, this difficult analysis is unnecessary.

proceedings, at the time of the motion to show cause and before the calculation of sanctions. In this case, the FTC's motion sought "an award of consumer redress commensurate with the total payments consumers made to defendants since they regained control of the business, less refunds defendants have made to consumers." App. at 42. This is clearly a request for compensatory sanctions. The conduct of the parties and the court throughout the proceedings similarly showed that the focus was on the amount of consumer injury that could be demonstrated, rather than punitive or other noncompensatory sanctions.

Nor can the fact that the FTC is not seeking redress for its own losses, but for those of consumers, remove this case from the auspices of civil contempt. We note initially that the defendants apparently did not raise this issue below, which generally precludes our consideration of it on appeal. *See Tele-Communications, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997); *In re Walker*, 959 F.2d 894, 896 (10th Cir. 1992). Furthermore, civil contempt proceedings are "considered to be a part of the action from which they stem." *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) (quoting 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1017, at 71 (1987)). This contempt claim stems from an original action brought pursuant to the FTC's powers under the FTC Act. As we discuss more fully below, Congress established the FTC at least in part "to protect consumers from economic injuries." *See FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997). Recognizing this, courts

-12-

have allowed the FTC to sue for "the full amount lost by consumers." *Id*.

The defendants correctly point out that the FTC is not entitled to rely on all the provisions of the FTC Act while also taking advantage of the simplified nature of a contempt action. The defendants agreed in the Permanent Injunction, however, that the FTC's role would be to remedy past allegations of consumer fraud and to pursue redress for consumers harmed by the defendants' conduct. App. at 1020, 1036. The defendants, in agreeing to the Permanent Injunction, knew that their ongoing business practices were subject to FTC and judicial oversight and that traditional remedies would be available for breach of their agreement. Not allowing the FTC to pursue contempt sanctions for the benefit of injured consumers in this case would serve neither the intent of Congress in creating the Commission nor the intent of the parties in agreeing to a settlement, civil damages, and ongoing regulation of the defendants' business practices through a permanent injunction. We therefore hold that the actions taken in this case are properly characterized as civil contempt proceedings.

C.

Though the panel concluded that the proceedings in this case were civil, it went on to find the injunction here so complex that it fell within its "*Bagwell* exception" and required heightened due process protections. In particular, the panel held that due process required the calculation of sanctions in this case to be made by a jury applying the clear and convincing standard of evidence. *Panel Opinion*, 312 F.3d at 1342.

-13-

We disagree that a jury is needed to meet due process requirements in a compensatory civil contempt proceeding. It is well-established in our circuit that compensatory contempt actions are appropriately held before a judge, applying a clear and convincing standard for liability and a preponderance of the evidence standard for sanctions. *See Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998). As explained above, nothing in *Bagwell* forces a contrary conclusion, and we decline to extend *Bagwell* in this case. Not only is the language from *Bagwell* relied on by the panel to establish a high-end exception dicta, but the panel decision would also create an exception the district courts would have difficulty applying on many levels, including during the determination of whether an injunction is complex or simple, when a jury is required, and what the jury's burden of proof should be.[4] We decline to go down this path and thus hold fast to the orthodox model for contempt actions. We therefore reiterate that in compensatory civil contempt proceedings a jury is not required; district court judges should require proof of contempt by clear and convincing evidence and

_____

[4] We note that none of the handful of cases cited by the panel in support of the idea of a "*Bagwell* exception" actually applied the exception, each finding that its case was a simple civil contempt action that did not require any additional procedural protections. *See United States v. Santee Sioux Tribe*, 254 F.3d 728, 736 (8th Cir. 2001); *NLRB v. Ironworkers Local 433*, 169 F.3d 1217, 1220 (9th Cir. 1999); *EEOC v. Local 638, Sheet Metal Workers' Int'l Ass'n*, 13 F. Supp. 2d 453, 458 (S.D.N.Y. 1998). Conversely, *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), cited by the corporate defendants and H.G. Kuykendall, Jr., involved what the court found to be criminal sanctions not related to the alleged contempt. *Id*. at 1146. It therefore fell within *Bagwell*'s definition of criminal contempt and is not applicable to this case.

proof of the amount of compensatory damages by a preponderance of the evidence.

## III.

### NOTICE AND HEARING

The defendants claim that even under the traditional civil contempt regime, the process below was constitutionally deficient because the district court (1) failed to give them sufficient time for discovery, (2) did not allow them to prepare adequately for the show cause hearing, and (3) did not permit meaningful pretrial motions to challenge the merits of the FTC's allegations or the admissibility of certain evidence. When analyzing claims relating to a party's ability to present its case, we apply the longstanding rule that in civil contempt proceedings all that is required to satisfy the Due Process Clause is that defendants be given reasonable notice and an opportunity to be heard. *See Bagwell*, 512 U.S. at 827.

The defendants make much of the fact that for nearly five years the FTC expressed no concern with their telemarketing practices and then, after the April 2001 letter and visit, again went silent for nine months to prepare its case. Meanwhile, the defendants were not apprised of any developments and were given only a few weeks after the filing of the motion to show cause to prepare for the hearing at which the FTC sought and received tens of millions of dollars in sanctions. Though we find the FTC's behavior in this case questionable, we cannot agree that it amounts to "subverting the most basic principles of the American justice system" or a denial of due process. Opening Br. of

H.G. Kuykendall, Sr., & C.H. Kuykendall at 6 (filed May 28, 2002).[5]

It must also be noted that the defendants, in exchange for the dismissal of the Commission's original claim against them, agreed to the Permanent Injunction. By agreeing to an ongoing court-supervised Permanent Injunction prospective in nature, the defendants were aware they were subjecting themselves to the lowered procedural protections available in the event of contempt proceedings. *See D. Patrick*, 8 F.3d at 459 (quoting 11 Wright & Miller, *supra*, § 2960, at 590). Moreover, the Permanent Injunction did not require the FTC to provide the defendants with any updates, nor did it limit the dates of violations or the amounts for which the FTC could seek redress.

After the April 2001 letter, the defendants were aware the FTC was investigating whether their practices violated the Permanent Injunction, and they had ten months to conduct their own investigation and to consider possible defenses to any claim the FTC might have brought. They had nearly a month to respond to the specific allegations in the show cause motion and to prepare for the hearing.

In addition, most of the FTC's evidence consisted of the defendants' own records, to which the defendants obviously had equal access, and the testimony of the defendants themselves, their employees, and their customers. At the hearing, the FTC presented

---

[5] In any event, it should be lost on no one that the inadequacies in the evidence presented by the FTC and the paucity of the district court's fact-finding on liability and damages detailed below may well have been cured by additional discovery by both sides and less precipitous proceedings.

testimony from eight witnesses, including the defendants and two of their employees, an investigator from the office of the Oklahoma Attorney General, and two consumers. They also produced written evidence of hundreds of consumer complaints made to the FTC, state attorneys general, and other agencies, such as Better Business Bureaus, all of which had previously been forwarded to the defendants and were in their possession.

The defendants were able to testify on their own behalf, introduce the testimony of others, cross examine the FTC's witnesses, and introduce their business records into evidence. The defendants also had the opportunity at any time to contact other customers to discover any mitigating evidence, but apparently did not do so. *See* App. at 772. The defendants did present the testimony of the general manager of DMS, who discussed his own investigation into consumer declarations, including his review of tapes of calls with these consumers and records of correspondence. His conclusion that most of the declarations were inaccurate was heard by the court. *Id.* at 934, 948–65.

We certainly agree with the defendants that the Commission's conduct raises questions about its bona fides. We cannot help but wonder why the Commission failed to inform the defendants that the scripts submitted for review by the FTC's court-appointed receiver were misleading, *see* App. at 886–87, and why, if the defendants' conduct was as grievous to the public as the FTC claims, the Commission waited five years to do anything about it. Surely the public would have been better served had the Commission

-17-

paid closer attention to the defendants' activities before 2001.[6]  We also are cognizant

that the district court limited the time and scope of the evidence it would hear and did not

give the defendants as much leeway as they would have preferred.

Nonetheless, courts in civil contempt proceedings may proceed in a "more

summary fashion" than in an "independent civil action."  *See D. Patrick*, 8 F.3d at 459

(citing 11 Wright & Miller, § 2960, at 590).  The defendants here agreed to that

procedural structure by agreeing to the Permanent Injunction.  They had notice from April

2001 that they should investigate whether their practices might have violated the terms of

the Permanent Injunction and had time to prepare for a possible contempt action.  The

district court allowed them to respond to the evidence presented by the FTC and to

introduce their own evidence.  Most of the evidence in this case involved the defendants'

own behavior and their own records.  They have not given the district court or this court

any reason to believe they would have found any significant evidence had they been given

more time or discretion to conduct discovery.  Indeed, the defendants told the district

court at the end of the hearing that they had no more witnesses and did not need any more

time to present their case. App. at 1006–07.  In this civil contempt proceeding, therefore,

---

[6] To the extent these questions give rise to a concern that the FTC waited until it could obtain a large monetary settlement, it should be allayed by our holding in Part V below, which makes clear that any damages the FTC receives must be distributed to injured consumers and cannot be retained.  Similarly, our discussion of the various defendants' liability in Part IV should make clear that although civil contempt actions do not require heightened due process requirements, courts still must insist on sufficient evidence to establish contempt and damages.

the court gave the defendants adequate notice and opportunity to be heard to satisfy the Due Process Clause.

## IV.

## VIOLATIONS OF THE PERMANENT INJUNCTION

Having held that the district court appropriately conducted the proceedings below as civil contempt proceedings, we turn to the specifics of the court's finding of contempt for each of the defendants. We review a district court's determination of civil contempt for abuse of discretion. *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1209 (10th Cir. 1992). "Abuse of discretion is established if the district court's adjudication of the contempt proceedings is based upon an error of law or a clearly erroneous finding of fact." *John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001) (internal quotation omitted). Though this standard is deferential, a district court must provide findings of facts on which it bases its judgment sufficient to make possible meaningful appellate review. *See* Fed. R. Civ. P. 52(a); *Wolfe v. Dep't of Human Res.*, 69 F.3d 1081, 1087 (10th Cir. 1995).

As discussed above, in the civil contempt context, a plaintiff must prove liability by clear and convincing evidence. *Reliance Ins. Co v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998). This means the FTC "has the burden of proving, by clear and convincing evidence, [1] that a valid court order existed, [2] that the defendant[s] had knowledge of the order, and [3] that the defendant[s] disobeyed the order." *Id.* (citations

-19-

omitted).  There is no question here that the defendants had knowledge that a court order—the Permanent Injunction—was in effect.  The issues on appeal are (1) what the Permanent Injunction required of each defendant and (2) whether the evidence clearly and convincingly showed that each defendant failed to comply with those requirements.

The district court's contempt order states, "The evidence clearly and convincingly indicates that defendants' acts and practices in connection with the sale of magazine subscriptions and magazine subscription packages violate the following injunctive provisions of the Permanent Injunction: Paragraph I, Paragraph II, Paragraph VII, Paragraph IX, and Paragraph XIII."  In essence, the paragraphs cited required the defendants to refrain from misrepresenting the nature of the subscriptions they sold, in particular their true cost, duration and cancellation policies; to refrain from threatening to report customers to credit bureaus; and to allow consumers who were misled to cancel their subscriptions.

A.

DMS

The district court's finding that DMS violated the above provisions was not an abuse of discretion.  The record contains direct testimony of two customers regarding conduct of DMS telemarketers found to violate the Permanent Injunction and written evidence of sixty-seven other direct consumer complaints and 874 complaints lodged with third parties, such as state Better Business Bureaus and attorneys general.  The record also

contains copies of the scripts used throughout the period by DMS's telemarketers and audiotapes of a number of calls, all of which support the district court's finding of "many instances of misrepresentation of [the cost, nature, and cancellation policies of the magazine subscription packages it sold] and violating the Telemarketing Sales Rule." App. at 557–58.

For example, according to one script, the DMS telemarketer was to lead potential customers to believe they "have been selected for [DMS's] New Millennium all cash Sweepstakes" to win $50,000. *Id*. at 1250. Then, the telemarketer was directed to tell consumers that as a contestant in the sweepstakes they could participate in "a very special part of our promotion," which would entitle them to a free diamond watch and four free magazines if they paid $3.45 per week for the next 48 months. *Id*. Other scripts followed a similar pattern, some offering "free" airline tickets that actually required costly multiple day tie-in stays at resorts or hotels. *See id*. at 1250–57.

After a customer indicated interest, the initial caller would transfer the prospect to another employee who would close and verify the deal. In rapid fire and confusing language, the DMS caller would again emphasize the customer's entry in the "sweepstakes" and would obtain the customer's credit card information. The script would offer the customer the choice of paying on either a two or three-month plan, pursuant to which the customer would pay either two or three months' worth of their subscription cost each month, thus frontloading the cost of the package. *Id*. at 1254.

Only at this point would DMS begin to record the conversation and tell customers the total price of the subscriptions they were buying. *Id*. at 1255–56.

Two DMS customers, Mary Steward and Jessica Villalobos, testified specifically that the telemarketers deceived them about what they were purchasing and authorizing and refused to cancel their orders when they later complained. *See id*. at 582–96, 623–36. Another customer declared that she understood she would only have to pay $1 for each of twelve magazines per month as a shipping charge. After her credit card was charged $64 per month, DMS refused to cancel her subscription and threatened to report her to a credit reporting agency. *Id.* at 1199–1200. She and other customers said they were either misled about cancellation or not given the information necessary to cancel their orders until after the closing of DMS's two-day cancellation window. *See, e.g.*, *id*. at 1199–1200, 1203–04, 1207, 1225–29, 1231–32, 1235–38, 1241, 1246–47.

Hundreds of written declarations and complaints likewise show pervasive confusion about the total cost, duration, and cancellation policies of DMS's subscription packages. *Id*. at 1099–1147, 1199–1248, 1358–1811. Audiotapes and transcripts reveal conversations between customers in various states of bewilderment and frustration and DMS representatives who spoke quickly, did not clearly state the dollar and cents amounts involved either in the monthly billing or the total subscription costs, and generally ignored the specific questions asked. *See* Aplt. Addendum, Exs. 19A, 22A, 26A, 26B; App. at 1008, 1266.

This evidence supports the district court's finding that DMS misrepresented the cost and duration of subscription packages and consumers' ability to cancel subscriptions. Because such conduct was prohibited under the Permanent Injunction, the district court did not abuse its discretion in holding DMS in contempt.

B.

Other Corporate Defendants

Contrary to the district court's ruling, finding that DMS's actions were contrary to the promises it made in the Permanent Injunction does not necessarily mean that every defendant who signed the Permanent Injunction is jointly and severally liable for that conduct. The FTC also sought contempt sanctions against National Marketing Service, Inc.; NPC Corporation of the Midwest, Inc.; and Magazine Club Billing Service, Inc. It is axiomatic that each defendant is entitled to "an individualized determination of his interests." *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994). The district court's only acknowledgment of this requirement is the conclusory statement that "[e]ach individual defendant, during the applicable time period, controls or has authority to control one or more of the corporate defendants." App. at 557.

Neither the court nor the FTC pointed us to any evidence that any corporate defendant other than DMS engaged in any of the conduct outlined above in Part IV.A, nor has our review of the record revealed any. Indeed, from all that appears in the record, the complaining customers seem only to have dealt with DMS employees. *See* App. at

1099–1249.  The FTC has also failed to provide us with any reason to believe the other corporate defendants could control DMS, or that the corporate structure was nothing more than an effort to conceal the assets of DMS and not a legitimate liability-limiting arrangement.  *Cf. Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985) (engaging in a piercing-the-corporate-veil analysis and finding owner liable where "the record supports the district court's finding that the defendant had engaged in a deliberate effort to hide his assets").  Their only apparent relationship to the activities at DMS appears to have been in receiving payment for ancillary services, such as equipment leasing, billing, and collecting provided to DMS, and sharing some common ownership interests with DMS.  App. at 760–61, 1054–55.

Although there may be reason to believe the other corporate defendants were part of a "common enterprise" to fraudulently sell magazines, the FTC failed to put evidence of such activity in the record to satisfy the clear and convincing evidence standard. Because the FTC provided no clear evidence that any corporation other than DMS failed to comply with any specific provision of the Permanent Injunction or could have controlled the activities at DMS, they cannot be held vicariously in contempt, and the district court abused its discretion in so holding them.[7]

---

[7] The FTC argues that the defendants waived their right to argue this point because they did not raise it below.  *See* Aple. Br. at 54 (filed July 9, 2002).  It was the FTC's burden, however, to provide clear and convincing evidence of each defendant's contempt, and the defendants had no obligation to rebut evidence that was not presented.

## C.

## H.G. Kuykendall, Jr.

H.G. Kuykendall, Jr., signed the Permanent Injunction, both as an individual and as an officer of DMS, and served as president of DMS throughout the period during which these violations occurred. "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs." *Wilson v. United States,* 221 U.S. 361, 376 (1911). H.G. Kuykendall, Jr., himself told the district court, "I'm the one that's responsible for everything." App. at 779. He therefore was obligated "to take appropriate action within [his] power for the performance of the corporate duty" and may appropriately be held jointly liable for the contempt. *Wilson*, 221 U.S. at 376; s*ee also United States v. Voss*, 82 F.3d 1521, 1526 (10th Cir. 1996) (holding that individual liability for contempt "may arise from the agent's general control over the organization's operations").

Having failed to prevent the employees of the corporation for which he was responsible from misleading consumers, H.G. Kuykendall, Jr., violated the requirements of the Permanent Injunction. The district court did not abuse its discretion by holding him in contempt.

## D.

## The Senior Kuykendalls

The record justification for holding the Seniors liable is not so clear. A court may

find individuals in contempt of injunctions like that involved here under three circumstances. One is exemplified by the liability of H.G. Kuykendall, Jr., and involves the failure of an individual in control of a corporation to prevent the corporation's violation of an injunction. *See Wilson*, 221 U.S. at 376; *Voss*, 82 F.3d at 1526.

Second, a direct, personal violation of the terms of an injunction would, of course, be a legitimate basis for holding an individual liable. *See Voss*, 82 F.3d at 1526. For example, Paragraph XVIII of the Permanent Injunction required the individual defendants to inform the FTC within ten days of "any change in his employment status." App. at 1038. This is an explicit agreement by the individuals who signed the Permanent Injunction to take a certain action, and failure to do so could be the basis for contempt liability.

Finally, an individual could agree contractually in the Permanent Injunction to insure the compliance of a corporate entity. Even if the individual were not "officially responsible" for oversight of the corporation, if the corporation thereafter violated the Permanent Injunction, the individual could be held in contempt for failing to fulfill the contractual agreement. We discuss these theories in turn.

As a preliminary matter, we must note that even in a contempt proceeding, a district court must follow the strictures of Federal Rule of Civil Procedure 52(a) and provide findings of facts on which it bases its judgment sufficient to make possible meaningful appellate review. *See Wolfe*, 69 F.3d at 1087. The district court's contempt

order in this case provides us with very little upon which to base our review of the Seniors' liability. As pointed out above, the only finding in the order that ties the Seniors to the contempt is the conclusion that "[e]ach individual defendant, during the applicable time period, controls or has authority to control one or more of the corporate defendants." App. at 557. The order refers to no supporting facts or evidence, specifically those providing any basis for clearly determining whether any particular individual defendant had such control over the organizations' operations that he could have done anything to ensure compliance with the Permanent Injunction.

Nonetheless, because of our deferential standard of review, we have studied the record to determine whether it supports the Seniors' joint liability with the other defendants. The five paragraphs of the Permanent Injunction the court found the Seniors to have violated all involve the interaction of the magazine business with customers and potential customers. We have found no evidence or even any allegation that the Seniors were personally involved in these aspects of the business. And, as discussed above, none of the corporate defendants other than DMS was shown to have acted contumaciously, so the Seniors' involvement in those corporations may not be the source of liability. Thus, the Seniors' liability, if any, must flow either from their having agreed to insure DMS's compliance or from official responsibility for the affairs of DMS.

As the FTC acknowledged at oral argument, Paragraph X is the provision of the Permanent Injunction that most nearly suggests an agreement by the defendants to insure

-27-

one another's compliance. That paragraph requires the "defendants" to implement a compliance program. Because all the signatories to the Permanent Injunction (including the Seniors) are "defendants," the FTC argues this obligates all signatories to oversee the compliance monitoring program and other aspects of Paragraph X.

Some evidence exists to support such a reading. The strongest such evidence is the Seniors' testimony at the contempt hearing that they understood the Permanent Injunction placed some affirmative obligations on them and that, partly in response to that understanding, they helped the companies set up a compliance system. They also testified that they occasionally received and read the reports generated by the compliance system. App. at 680, 690–91, 704.

We are nonetheless not convinced that Paragraph X can be read so broadly as to make the Seniors insurers of the other defendants' compliance. First, it is important to note that nothing in the district court's contempt order suggests the district court was relying on this reading of the Permanent Injunction to find the Seniors in contempt. Equally important, the district court did not find, and the FTC did not even allege, that any defendants, including the Seniors, actually violated Paragraph X. Furthermore, the Permanent Injunction must not be read in the light most favorable to the FTC, but rather must be strictly construed, *see Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371 (10th Cir. 1996), to ensure it is clear enough to place a defendant on notice of what he must do to comply. *See Voss*, 82 F.3d at 1525. Any ambiguities should be

read in the light most favorable to the defendants. *Id.*

The agreement would have to be much more explicit if it were in fact intended to bind individual defendants as guarantors of compliance for corporations over which they have no official responsibility, particularly in a case where the FTC seeks to hold those individuals liable for $51 million in consumer redress.[8] *See id.* This contractual theory thus cannot serve as the basis for the Senior's liability.

That leaves the control theory suggested by the district court's order and under which the district court appropriately found H.G. Kuykendall, Jr., liable. The FTC and the panel emphasized our holding in *Voss* that "an individual who is responsible for insuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility." *See id.* at 1526 (quoting *Colonial Williamsburg Foundation v. Kittinger Co.*, 792 F. Supp. 1397, 1406 (E.D. Va. 1992)). We agree, but before this becomes a relevant issue, the FTC must have met its burden of providing clear and convincing evidence that the Seniors had the management control or power to prevent the contempt in the first place.

---

[8] Paragraph XVIII puts affirmative obligations on the individual signatories, requiring them to inform the FTC within ten days of any change in their employment status with the corporate defendants. It is not clear from the record whether the Seniors, in admitting they knew the Permanent Injunction placed some affirmative obligations on them, were referring to Paragraph X or XVIII. In any event, the FTC and the court did not suggest either Paragraph X or Paragraph XVIII as a basis for contempt.

The FTC admits the Seniors did not hold official positions with any of the corporations during the period in question, but asserts they nevertheless had the authority to control the corporations. It bases this assertion on two facts: that the Seniors signed the Permanent Injunction as officers of some of the corporate defendants and that together the Seniors owned a majority of the stock of DMS. *See* App. at 676–79, 684–85, 697–701.

Notably, neither H.G. Kuykendall, Sr., nor C.H. Kuykendall signed as an officer of DMS, the only corporate entity involved in the contumacy, although they both signed the Permanent Injunction individually and as officers of National Marketing Service, Inc.; NPC Corporation of the Midwest, Inc.; and Magazine Club Billing Service, Inc. Since the evidence that the other corporate defendants committed contempt or could control DMS is inadequate, the Seniors' alleged ability to control them is irrelevant to their individual liability and is not a legitimate reason to hold them in contempt.

Even if the actions of the other corporations were relevant, these signatures are the only evidence that the Seniors held any official role with any of the corporations during the period in question, and the other evidence, which the FTC does not dispute, shows that neither has had any official position at any corporate defendant since before the execution of the Permanent Injunction. *See id*. at 164. Both testified at the hearing in this case and provided separate affidavits declaring that they had resigned from all of their corporate positions in March of 1995, well before the dates relevant to this contempt proceeding. *Id*. at 164–67. The FTC seems to agree, stating in its brief that "the Senior

Kuykendalls no longer held official positions in the corporations." Aple. Supp. Br. on Reh'g En Banc at 29 (filed July 3, 2003). The FTC in no way claims the Seniors fraudulently led them to believe they actually had control of the corporations at the time they entered into the Permanent Injunction.

The Senior Kuykendalls could not confer on themselves actual control over the corporations simply by signing as officers.[9] Since no evidence exists that the Seniors actually were officers, these signatures cannot serve as the basis for finding that the Seniors had the official power necessary to hold them liable. *See Wilson*, 221 U.S. at 376.

The only remaining justification for holding the Seniors liable is their ownership interests in the corporate entities, particularly DMS. The record is again barren on this point. The FTC did not introduce any corporate records or other evidence that the district court could have used to support its finding that the Seniors had the power to prevent the contempt.

The only evidence we have as to the Seniors' ownership is their own testimony, which does not support a finding that either H.G. Kuykendall, Sr., or C.H. Kuykendall had a controlling interest in any of the corporations at any time the Permanent Injunction

---

[9] The reason the Seniors signed as officers given these facts is not clear to us. The most plausible explanation is that because the Seniors were officers when the FTC's initial investigation began and continued to participate in the negotiation of the Permanent Injunction, they were simply included on the forms. Such carelessness in the execution of the Permanent Injunction confuses the issue of contempt, but does not support a finding of liability.

was in effect. H.G. Kuykendall, Sr., did testify that as a "co-owner" of DMS at the time of the Permanent Injunction he, collectively with C.H., could have removed H.G. Kuykendall, Jr., as president. App. at 677. C.H. Kuykendall testified that he thought the Seniors' combined holdings in DMS was less than eighty-five percent. *Id*. at 698. The only evidence as to either defendant's individual ownership share is H.G. Kuykendall, Sr.'s statement that he "never owned all of it, or half of it." *Id.* at 687.

This limited testimony does not support a finding that either Senior had a controlling interest in any corporate defendant during the relevant time period. Though the Seniors together may have owned a majority interest in the corporations, as noted above, each individual is entitled to "an individualized determination of his interests." *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994). In *Voss*, this court held that there must be a finding that the defendant was "somehow *personally* connected with" the contempt. 82 F.3d at 1526 (quotation omitted); *see also McGregor v. Chierico*, 206 F.3d 1378, 1383–84 (11th Cir. 2000) (agreeing with defendant's claim that the FTC and district court had "simply lumped together all of the defendants without considering the weight of the evidence as it applied to each individual and corporate defendant").

In this case the FTC did not introduce evidence that would support a finding that either individual Senior had "effective control" of DMS or treated the corporate defendants as "alter egos." *Cf. Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985). Nor do the FTC or the district court appear to have endeavored to

find clear and convincing evidence that the Seniors together in fact exerted control over DMS in such a way as to be personally connected with the contumacy. Indeed, the evidence shows the Seniors had no executive role with any of the corporations from the time of the Permanent Injunction and received no income from DMS. *See* App. at 678, 688. Because no evidence exists in the record to support the district court's finding that the Seniors could control, and therefore prevent, the contempt committed at DMS, that finding is in error.

Though contempt proceedings may have somewhat diluted procedural requirements, they do not lessen the need for clear and convincing evidence of a defendant's liability. *See United States v. Microsoft Corp.*, 147 F.3d 935, 940 (D.C. Cir. 1998). The FTC and the district court here simply skipped over a determination of individual culpability, focusing almost entirely on the nature and extent of the contempt itself. Having found such contempt, they then simply assumed every signatory to the original Permanent Injunction was jointly and severally liable for its breach. Even in the streamlined context of a contempt hearing, this falls short of meeting the required standard of proof. *See McGregor*, 206 F.3d at 1383–84. The district court's ruling that the Seniors were in contempt was thus based on a clearly erroneous fact finding and a misapplication of the law. We therefore reverse the district court's judgment as it relates to the liability of H.G. Kuykendall, Sr., and C.H. Kuykendall.

## V.

## CONTEMPT SANCTIONS

Having concluded that the district court did not abuse its discretion in finding

DMS and H.G. Kuykendall, Jr., liable for civil contempt, we turn now to the question of

what sanctions the district court may assess against them. As noted in Part II.B above, the

FTC sought and the district court intended to grant compensatory sanctions. The district

court found the actual loss to consumers caused by the defendants' conduct to be at least

$39 million and, accordingly, ordered the defendants to pay that amount to the FTC "in

order to compensate the injuries resulting from [this] conduct." App. at 558; *see also*

*Panel Opinion*, 312 F.3d at 1337. While we review the amount of a damage award for

clear error, "[t]he methodology a district court uses in calculating a damage award, such

as determining the proper elements of the award or the proper scope of recovery, is a

question of law" we review de novo. *S. Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d

1094, 1100 (10th Cir. 1999).

Initially, we underscore that while the district court has the responsibility to assess

the facts and calculate actual damages based upon evidence presented at the contempt

hearing, *see FDIC v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997), it must set forth clear

reasons for its findings so this court has an adequate basis for review. *See Prairie Band*

*of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1245 (10th Cir. 2001) ("[W]ithout

adequate findings of fact and conclusions of law, appellate review is in general not

possible"); *see also In re Chase & Sanborn Corp.*, 872 F.2d 397, 398 (11th Cir. 1989) (vacating sanctions and remanding for findings because the court could not "determine what factors the trial judge considered in imposing the amount of the sanctions"). We agree with the panel that the district court failed to set forth an adequate basis for arriving at its $39 million figure and unduly hamstrung the parties in submitting evidence in the truncated proceedings. This constituted error that requires us to vacate the judgment and set forth the appropriate method for calculating damages on remand.

In doing so, we must address three questions. First, as a threshold matter, is the FTC authorized to seek sanctions on behalf of consumers in a compensatory civil contempt proceeding such as this one? Second, if such an action is allowed, how, if at all, should the court use the defendants' gross receipts in calculating compensatory sanctions? Finally, how should the district court administer whatever funds may be assessed to compensate injured consumers?

A.

The defendants argue that in a contempt action the FTC is not entitled to seek compensatory relief for injured consumers, none of whom is a party to the Permanent Injunction. We are not persuaded. The FTC Act explicitly authorizes the Commission to seek injunctions, such as the one into which the defendants entered in this case. *See* 15 U.S.C. § 53(b) (2000) ("[I]n proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."). The Permanent Injunction to which

the defendants consented contained enforcement provisions that by their terms allowed FTC action on behalf of consumers. Violation of a permanent injunction has traditionally sounded in contempt, and no reason exists to believe Congress intended to withhold the traditional remedy of compensation to those consumers victimized by the defendants' violations of the Permanent Injunction. *See FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (noting that a primary purpose of the FTC Act is "to protect consumers from economic injuries"). Accordingly, after proving a violation of the Permanent Injunction, the FTC was allowed to seek sanctions on behalf of injured consumers.

B.

The defendants alternatively argue that even if the FTC is entitled to seek remedies for injured consumers, the district court improperly used the defendants' gross receipts to calculate sanctions. As the panel correctly held, and as noted above, the district court failed to provide us with an adequate record of how it arrived at the $39 million figure. We agree with the parties, however, that an analysis of the role gross receipts should play in the sanctions calculation is necessary for an appropriate resolution of this appeal.

1.

When the FTC brings a civil contempt action to compensate injured consumers, it may seek contempt sanctions in an amount reflecting "complainants' actual loss." *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947); *see also O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992). Gross receipts may not be

-36-

an appropriate measure of actual loss to consumers in cases in which the FTC has only shown isolated instances of contumacy. When, however, the FTC has shown through clear and convincing evidence that defendants were engaged in a pattern or practice of contemptuous conduct, the district court may use the defendants' gross receipts as a starting point for assessing sanctions.[10] *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993) (allowing use of gross receipts where FTC proved that the defendant made misrepresentations and "that they were widely disseminated"); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) (same).

The defendants argue that use of gross receipts is improper because the FTC was not required to prove individual consumer injury and reliance. We disagree. "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949). In cases of pervasive, persistent contempt, the use of gross receipts simply allows courts to assure that those injured receive full compensation. To the extent the large number of consumers affected by the defendants' deceptive trade practices creates a risk of uncertainty, the defendants must bear that risk. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice

---

[10] We emphasize that "gross receipts," as used here, only refers to receipts from consumers. To the extent DMS or H.G. Kuykendall, Jr., received income from other sources, this analysis obviously does not apply, and those amounts may not be included in any sanctions calculation.

and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1162 n.1 (10th Cir. 1981).

The Eleventh Circuit directly addressed the role of gross receipts in the computation of sanctions in a contempt proceeding brought by the FTC and held that "[t]he analysis which applies to consumer remedies issued under section 13(b) [of the FTC Act] is instructive because the remedy for [the defendant's] contemptuous conduct is closely akin to the remedy for the statutory violation which lies at the heart of [such an] action." *McGregor v. Chierico*, 206 F.3d 1378, 1387–88 (11th Cir. 2000). The court found that allowing the district court to presume consumer reliance and calculate sanctions based on gross receipts would enable the FTC to fulfill its consumer protection purpose and compensate consumer loss. *Id*.; *see also FTC v. Gill*, 183 F. Supp. 2d 1171,1185–86 (C.D. Cal. 2001) (following *McGregor*).

Several courts have also addressed the defendants' argument in cases arising directly under the FTC Act and have held that gross receipts are an appropriate measure of actual loss because a presumption of consumer reliance arises when the FTC shows "that the misrepresentations or omissions were of a kind usually relied upon by reasonable and prudent persons, that they were widely disseminated, and that the injured consumers actually purchased the defendants' products." *Security Rare Coin*, 931 F.2d at 1316 (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)); *see also*

*Febre*, 128 F.3d at 536 ("Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers.").

For example, in *Security Rare Coin*, a case arising under Section 13 of the FTC Act, the Eighth Circuit granted the FTC "the monetary equivalent of rescission for customers" by requiring the defendant to pay the entire purchase price as sanctions. 931 F.2d at 1313 (analyzing 15 U.S.C. § 53). The court relied on the fact that an FTC action is meant to redress the injuries of a large group of consumers and found that requiring the FTC to prove individual reliance by every consumer in order to calculate damages would thwart the FTC's ability to fulfill its statutory purpose. *See id*. at 1316 ("It would be virtually impossible for the FTC to offer such proof [of reliance by every customer], and to require it would thwart and frustrate the public purposes of FTC action."); *see also FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985).

In *Figgie*, the Ninth Circuit followed *Security Rare Coin* in a case brought under Section 19 of the FTC Act. This case involved damages somewhat akin to those allowed in a civil contempt case because Section 19 prohibits "exemplary or punitive damages." 15 U.S.C. § 57b(b). The court held that allowing the FTC to collect the entire purchase price of defective products would enable it to redress actual consumer injury. *Figgie*, 994 F.2d at 605.

These cases illustrate that allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out

its statutory purpose.[11]  More importantly, they demonstrate that where a defendant has

engaged in a pattern or practice of contemptuously misleading consumers in violation of

an FTC Act-authorized injunction, using the defendant's gross receipts is a proper

baseline in calculating the amount of sanctions necessary to compensate injured

consumers.

2.

A baseline is only the beginning, however.  To accurately calculate actual loss, the

defendants must be allowed to put forth evidence showing that certain amounts should

offset the sanctions assessed against them.  *See Febre*, 128 F.3d at 535 ("The

Commission must show that its calculations reasonably approximated the amount of

customers' net losses, and then the burden shifts to the defendants to show that those

figures were inaccurate.").  For instance, the defendants might be able to show that some

customers received full refunds of their payments or that others were wholly satisfied

with their purchases and thus suffered no damages.  On this record, it is unclear how the

---

[11] While we acknowledge the differences between a case arising directly under the
FTC Act and a contempt proceeding, such cases provide a useful analogy.  *See In re
Kalpana Elec., Inc.*, 58 B.R. 326, 334 (Bankr. E.D.N.Y. 1986) ("The weight of authority
is to the effect that a civil contempt proceeding cannot be divorced from its underlying
case."); *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 449 (D. Conn. 1970)
("Since this is a civil contempt proceeding, the court is not bound by the statutory
provision. . . . However, since that statute relates to the subject matter underlying the
contempt and both parties refer the court to it, it is not inappropriate to utilize it to
measure the damages in this case."); *see also Jarrell v. Petoseed Co.*, 500 S.E.2d 793, 794
(S.C. 1998) ("A civil compensatory fine is analogous to a tort judgment for damages
caused by wrongful conduct.").

district court construed evidence related to refunds.

The defendants maintain that the district court should also offset gross receipts by the value of the magazines the consumers received. Other courts have addressed this issue in the context of unfair and deceptive trade practices. In *Figgie*, a case involving unwanted heat detectors, the court analogized its case to that of a dishonest jeweler who represented that the rhinestones he sold were diamonds and held that a customer's recovery should not be limited "to the difference between what they paid and a fair price for rhinestones" because if the customers had known the truth, they might not have bought any rhinestones at all. 994 F.2d at 606. Thus, "[t]he fraud in the selling, not the value of the thing sold, is what entitles consumers . . . to full refunds." *Id*.; *see also McGregor*, 206 F.3d at 1388–89 (applying this principle in contempt proceedings).

We follow the above analysis and conclude that the district court need not offset the value of any product the defrauded consumers received. Accordingly, when the FTC has proven a pattern or practice of contemptuous conduct at the liability stage by clear and convincing evidence, a presumption arises that allows the district court to use all revenue attributable to the contemptuous conduct—the gross receipts from consumers—as a baseline for assessing sanctions.[12] The defendants may then put forth

---

[12] The district court's order states that "the evidence clearly and convincingly indicates . . . many instances of" violations of the Permanent Injunction. App. at 557. "Many instances" do not necessarily constitute a pattern or practice of contemptuous conduct. On remand the district court must determine whether the evidence before it clearly and convincingly proves a pattern or practice of contempt by the defendants

-41-

evidence showing offset is required because certain consumers received refunds or were satisfied with their purchases.

C.

We now turn to how the district court should administer any funds assessed to compensate consumers. As noted, on remand the district court's contempt order should impose only those sanctions necessary to redress consumer injuries and cover the direct costs the FTC incurs in implementing consumer redress, such as reasonable costs associated with locating and reimbursing defrauded consumers. *See Figgie*, 994 F.2d at 607 (allowing FTC to use sanctions to find purchasers of defective products, advertise to them the availability of the money, and process their claims and reimburse them). If the district court finds a pattern or practice of contumacious conduct, it should (1) calculate the gross receipts received from all consumers subjected to the contumacious acts of the defendants, (2) offset gross receipts to the extent the defendants prove that consumers either received refunds or were satisfied with their purchases, (3) order the liable defendants to pay the resulting amount into the registry of the court in accord with 28 U.S.C. § 2041, and (4) set forth procedures by which the FTC may access funds and

before it applies the gross receipts methodology outlined here.

If the district court finds the evidence does not contain such proof, the FTC will still be entitled to a remedy. In that case, however, the district court must limit the sanctions to the amount the FTC proves by a preponderance of the evidence is necessary to compensate the individual customers the FTC proves by clear and convincing evidence were the subjects of the contumacy.

reimburse consumers who have established their right to compensation. The FTC may receive funds only to reimburse injured consumers and for reasonable expenses associated with finding such consumers and processing their claims.

## VI.

## EVIDENTIARY ISSUES ON APPEAL

The defendants also raise evidentiary issues regarding the district court's admission of (1) consumer declarations and complaints under the residuary exception to the hearsay rule, Fed. R. Evid. 807, and (2) declarations of FTC employees summarizing boxes of consumer complaints. We agree with the panel that the district court did not exceed its discretionary authority in admitting the evidence. *See Panel Opinion*, 312 F.3d at 1343.

## VII.

## CONCLUSION

In conclusion, we affirm the district court's determination that this case is one of civil contempt. We further conclude that, because this case was one for civil, compensatory sanctions, the burden of proof is clear and convincing evidence as to liability and preponderance of the evidence as to damages. We affirm the district court's resolution of evidentiary issues.

We also affirm the district court's finding that DMS and H.G. Kuykendall, Jr., were in contempt of the Permanent Injunction. Because the record does not support the

district court's finding that the other corporate defendants and the Senior Kuykendalls were liable for contempt, however, we reverse the district court's judgment as it relates to them.

The district court may use gross receipts as a baseline for calculating consumer injury on remand if it is satisfied that the FTC has shown by clear and convincing evidence that the defendants engaged in a pattern or practice of contemptuous behavior. The defendants may then put forth evidence offsetting the sanctions alleged. The court should then order the liable defendants to pay the appropriate amount into the registry of the court, and set forth procedures by which the FTC may obtain funds to reimburse injured consumers.

The Panel Opinion is therefore vacated, the judgment of the district court is reversed in part, and the case is remanded for additional proceedings in accordance with this opinion.